R. E. "Buck" SOLOMON, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Oct. 17, 1972.

Certiorari Denied by Supreme Court
Jan. 15, 1973.

Donald G. Dickerson, Cookeville, for plaintiff in error.

David M. Pack, Atty. Gen., Robert H. Roberts, Asst. Atty. Gen., Nashville, Jacky O. Bellar, Asst. Dist. Atty. Gen., Carthage, for defendant in error.

## OPINION

WALKER, Presiding Judge.

The defendant, R. E. "Buck" Solomon, was indicted for first degree murder of Vernon Bennett. On his first trial December 1, 1970, the jury was unable to agree and the trial judge declared a mistrial. On the retrial March 30, 1971, under the same indictment the jury found him guilty of voluntary manslaughter and fixed his punishment at ten years in the penitentiary. From the judgment and sentence of two to ten years' imprisonment, Solomon appeals to this court.

The defendant and one Charles "Zee" Hensley had been working several months in Smith County and were friends of the deceased, Vernon Bennett, and drank whiskey with him. Solomon and Hensley had been in East Tennessee and left Jefferson County in Solomon's truck after midnight, January 18, 1970, and arrived in Carthage about 6:30 A.M. Before leaving Jefferson County Solomon's father undertook to get a .22 caliber pistol from him but the defendant said he would rather be without his boots. When Solomon and Hensley arrived at an apartment in Carthage one Charles Hesson, Jr., told Solomon to leave his pistol in the truck and he did so at that time. Solomon and Hensley then drove in the truck for some whiskey and they returned to the apartment. The deceased and Hesson were already there and the

four men drank together. Hensley and the defendant rented the apartment and there was some argument or discussion between Hensley and Hesson as to who would rent the apartment.

The defendant and the deceased were in the kitchen of the three-room apartment. Hensley and Hesson were in the adjoining bedroom. At about 9:00 or 10:00 A.M., Mrs. Helen Sexton, stepgranddaughter of the deceased, was in the adjacent apartment and heard the defendant say to the deceased, "Vernon, don't call me a son of a bitch," and the deceased reply, "I didn't call you a son of a bitch. If I did, I'm sorry." She then heard three shots and a lumbering sound. Bennett was shot through an eye and in the heart. He fell on a lighted heater. Hesson and Hensley heard the shots but their attention was not attracted to any conversation before the killing.

As the defendant came through the living room with pistol in hand, he told Hesson in substance that he had just shot Hesson's buddy or brother, not to come closer or he would shoot him; that he did not want to; that he liked Hesson. Hesson then stepped back and Solomon went out of the house.

The defendant threw his pistol on the house roof and went to the jail where he told the sheriff he was afraid there was going to be trouble at the address of the apartment and the sheriff should go there. About this time the sheriff received a telephone call from a lady and arrested the defendant.

The defendant next told officers that a stranger had come in the back door and shot Bennett. At that time he denied owning a pistol or having any knowledge about one. When officers found the pistol on the roof, Solomon admitted ownership but said the shooting was accidental; that he was coming from the bathroom with the revolver in his hand; the deceased grabbed for it and the gun went off. When the revolver was found, three shots had been fired and it was cocked. The defendant denied having any quarrel with Bennett but he told a TBI agent that Bennett cursed and called him a son of a bitch; that Bennett grabbed his left arm as he went through the door and that he did not intend to shoot; that he did not know how many times he fired.

Testifying in his own defense, Solomon said he was not drinking; that Bennett was drunk when he arrived at the apartment. He and Bennett were friends and had never had any argument. Bennett was a large man with a cork leg below the knee.

Solomon said he put his pistol on the kitchen table and was taking it to the next room to put it under the couch when the deceased grabbed him by the left arm and the pistol accidentally discharged. He denied that Bennett called him a son of a bitch and insists the shooting was not intentional. He said he does not recall a statement to Hesson that he had just shot Hesson's buddy.

■ The jury did not believe Solomon's explanation that the killing was accidental. The evidence abundantly sustains the verdict of guilty of voluntary manslaughter. The assignments on the weight of the evidence are overruled.

■■ The defendant contends that the court committed prejudicial error in permitting the introduction of evidence of his conviction of carrying a pistol about two months earlier. This evidence was not admissible either as an exception to the rule excluding other offenses or for the purpose of impeachment of the defendant. Convictions of offenses not involving moral turpitude may not be used for impeachment. Bolin v. State, Tenn.Cr.App., 472 S.W.2d 232. This record, however, is replete with evidence that the defendant habitually carried a pistol.

He constantly practiced firing a pistol and was a good shot; he shot the deceased between the eyes with one shot and

through the heart with another. The state's theory was that these shots were not accidental. The testimony shows that he had carried several .22 pistols. His conviction of carrying a pistol on one occasion was harmless error and not prejudicial in view of this record. T.C.A. 27–117.

We find no error in the trial judge's rulings on the scope of the voir dire examination of the jury. The defendant by a hypothetical question sought to commit the jurors to a course of action. The trial judge has wide discretion in these matters, and his action will not be reversed unless there has been an abuse of this discretion. No such abuse appears here. See Layman v. State, 1 Tenn.Cr.App. 83, 429 S.W.2d 832. We likewise find no error in the trial judge's remarks to the attorneys on involuntary manslaughter during the voir dire examination. We think there was no error in the admission of a photograph of the deceased showing his wounds.

The defendant contends that the court erred in permitting the state to introduce testimony that the deceased was a peaceful and nonviolent individual. This evidence was incompetent and immaterial but we think it was not prejudicial. The defendant did not attack the character of the deceased; he did not claim self-defense but contended that he and the deceased were friends and the shooting entirely accidental. Even on a claim of self-defense, the state may not offer evidence of the quiet, peaceable reputation of the deceased in advance but such evidence is admissible only to rebut evidence adduced by the accused, attacking the deceased. See Underhill's Criminal Evidence, Fifth Edition, Sec. 647; 40 C.J.S. Homicide § 222. This evidence should have been excluded but in consideration of this record and the defendant's theory of the case it was harmless.

The defendant next contends that he was twice placed in jeopardy by the trial judge instructing the jury on first and second degree murder and voluntary manslaughter. He urges that he was acquitted of these offenses at his first trial when the jury was polled before a mistrial was declared. The jury could not agree and the court permitted a poll which resulted in five announcing not guilty, six announcing either involuntary manslaughter or accidental and juror Langford responding guilty without explanation.

The defendant did not seek to have juror Langford clarify his answer before the jury dispersed. Four months later at the second trial the defendant sought to have the juror testify and the court declined to permit him to explain the answer he made before the jury dispersed at the mistrial four months before. We do not think the court erred in refusing to permit juror Langford to testify at the second trial in explanation of his answer at the previous trial when the jury could not agree on a verdict. This assignment is overruled.

All assignments have been fully considered and are found without merit.

The judgment is affirmed.

OLIVER, J., concurs.

GALBREATH, J., dissents.

OLIVER, Judge (concurring).

In my view, we must go further and deal specifically with the admitted basis of the defendant's double jeopardy contention; that is, that replies of the jurors, when "polled" by the court after they reported hopeless deadlock and inability to agree upon a verdict, showed that they acquitted him of murder and it was, therefore, placing him twice in jeopardy to put him to trial again upon the same indictment.

It is fundamental that a demand or request for a poll of the jury may be and must be made only after announcement of the verdict, the purpose being to determine

whether the individual members agree with the verdict as announced. "It's object is to ascertain for a certainty that each of the jurors approves of the verdict as returned." Humphries v. District of Columbia, 174 U.S. 190, 194, 19 S.Ct. 637, 638, 43 L.Ed. 944. See also: Webb v. State, 166 Ga. 218, 142 S.E. 898; State v. Blisak, 58 A.2d 711, 26 N.J.Misc. 197; State v. Brooks, 59 N.M. 130, 279 P.2d 1048; State v. Windley, 178 N.C. 670, 100 S.E. 116; 5 Wharton's Criminal Law & Procedure (Anderson) §§ 2142, 2144; 49 A.L.R.2d 619, §§ 1, 6.

"The question put to a juror on polling must be simply, 'It [is] this your verdict?' If the answer is evasive or qualified, the judge may direct the juror to answer yes or no. If the answer is in the affirmative, further inquiry is inadmissible." 5 Wharton's Criminal Law & Procedure (Anderson) § 2144, pp. 332–333.

The natural and necessary concomitant of these established principles is the further settled rule that it is premature and impermissible to poll the jury before the verdict is announced. Cable v. State (Miss.), 38 So. 98; State v. Windley, supra; Tilton v. State, 52 Ga. 478; State v. Brooks, supra.

In State v. Brooks, supra, which was a prosecution for murder, the defendant, when it was apparent that the jury would be unable to agree upon a verdict, moved the court to poll the jury to ascertain if the jury had arrived at a verdict of conviction or acquittal either of first degree murder, second degree murder, or manslaughter, and if so, to return a verdict accordingly. The motion was taken under advisement and the jury was directed to consider the case further. Later in the same day, the jury still being unable to agree on a verdict, a mistrial was declared and the jury was discharged. The court then ruled on the motion, denying the same. This ruling was sustained on appeal. The court stated that while the parties to either criminal or civil cases have a right to poll the jury to

ascertain whether the verdict rendered is the verdict of each individual juror, a request to have the jury polled before the verdict is rendered is premature and should be denied.

The present case indicates one of the difficulties that may result from the failure of trial courts to adhere scrupulously to these sound and settled legal principles.

Moreover, in this case the unalterable fact remains that the first trial ended in a mistrial.

The law is universal that dismissal of a jury which cannot agree upon a verdict does not acquit the defendant and his subsequent retrial does not constitute double jeopardy. State v. Malouf, 199 Tenn. 496, 287 S.W.2d 79.

Contrary to the defendant's insistence, this principle of law, grounded in sound public policy, is neither abrogated nor rendered inapplicable in this case by the circumstance that in the first trial the trial judge allowed himself to be led into the error of "polling" the hung jury and elicited each member's individual view of the case.

GALBREATH, Judge (dissenting).

I must respectfully dissent from the holding by the majority that the defendant was not twice placed in jeopardy in violation of the Federal and State Constitutions.

The jury in the first trial for first degree murder, it must be assumed, followed the instructions by the trial judge to first inquire during their deliberations if the defendant was guilty of murder in the first degree as explained to them, and that if they had a reasonable doubt as to his guilt or innocence of that crime they must acquit him and next proceed to a determination as to his guilt or innocence of murder in the second degree, etc.

From the bill of exceptions preserved showing the conclusions reached, or not

reached, by the former jury the following occurred when the jury announced that they were deadlocked after receiving instructions again on the difference between voluntary and involuntary manslaughter:

"MR. HAILE: Your Honor, before the Jury is dismissed, I move Your Honor to poll the jury.

THE COURT: I have no objection.

GEN. BELLAR: We don't object.

THE COURT: When Mrs. Dillehay calls the roll—for example, I am the first Juror she calls, I would say, 'Not Guilty.' General Knowles would be the second and he would say, 'Guilty of involuntary manslaughter or voluntary manslaughter or whatever it is, do you understand. *When your name is called just say not guilty of anything or guilty of one of the two.*

THE CLERK: Mrs. Oakley.

THE JUROR: Involuntary Manslaughter.

THE CLERK: Mrs. West.

THE JUROR: Guilty of Involuntary Manslaughter.

THE CLERK: Glenn Anderson.

THE JUROR: Accidental.

THE CLERK: Roger Kemp.

THE JUROR: Not guilty.

THE CLERK: Rex Shoulders.

THE JUROR: Not guilty.

THE CLERK: Don Langford.

THE JUROR: Guilty.

THE CLERK: Jack Dillehay.

THE JUROR: Accidental.

THE CLERK: Cordell McDonald.

THE JUROR: Involuntary Manslaughter.

THE CLERK: Mr. Goad.

THE JUROR: Involuntary Manslaughter.

THE CLERK: Muddy Mason.

THE JUROR: Involuntary Manslaughter.

THE CLERK: L. B. Martin.

THE JUROR: Involuntary Manslaughter.

THE CLERK: Ross Wilmore.

THE JUROR: Accidental.

Thereupon, the Jury was discharged. Court was adjourned."

From the emphasized language of the trial judge it is clear that he instructed the jury to report their individual verdicts on the guilt or innocence of the defendant "of one of the two" manslaughter charges that they had inquired about shortly before. If Juror Langford followed the instruction of the court, and we must presume that he did, this means that his verdict of guilt related to manslaughter, not murder.

The above is not a mere exercise in mental gymnastics, but is the inescapable conclusion that must be reached on the plain facts. Therefore it is clear to me that the defendant was formerly acquitted of murder, and to force him to run the gauntlet again and defend himself on the same charge constituted double jeopardy.

In essence the jury said: "We find the defendant not guilty of murder in the first and second degree and are unable to agree on manslaughter." If these words had been literally used, would there be any doubt as to the defendant's acquittal of murder? Frankly, I think it would be good practice for the court to make specific inquiry in cases involving lesser included offenses when it appears the jury is unable to reach overall agreement to ascertain if they have unanimously reached a verdict on any of the offenses. If a jury of his

peers has reached a verdict of not guilty, this should acquit, and it is my position that a judgment of acquittal should have been entered by way of correction of the former judgment of mistrial.

Suppose, arguendo, the defendant had been tried on consolidated charges of murder and larceny from the victim and the jury had acquitted him of murder but had been hopelessly deadlocked on larceny. Would anyone suggest that the State should again be given an opportunity to convict him of murder? If there is any difference in the actual and hypothetical situations, it is surely difference without distinction. Constitutional safeguards should not be so grudgingly protected or so reluctantly granted.

I would reverse and remand for a new trial limited to manslaughter.