**STATE of Tennessee, Appellee,**

v.

**Rosa CHESTNUT, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

July 20, 1982.

Permission to Appeal Denied by Supreme Court Oct. 4, 1982.

Jerry H. Summers, Chattanooga, for appellant.

William M. Leech, Jr., Atty. Gen., Robert L. Jolley, Jr., Senior Asst. Atty. Gen., Nashville, Gary D. Gerbitz, Dist. Atty. Gen., Thomas J. Evans, John W. Goza, Jr., Asst. Dist. Attys. Gen., Chattanooga, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of twenty-one counts of embezzlement and received twenty-one terms of not less than three nor more than three years in the state penitentiary, all to be served concurrently. Her application for probation was denied. In this appeal the appellant has presented eleven issues for our consideration.

In the first issue the appellant questions whether the trial judge erred in denying a mistrial when two of the petit jurors fell asleep during the prosecution's case. She contends that her constitutional rights to due process of law under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, Section 8 of the Tennessee Constitution were violated.

During the testimony of Winton Stanley Sweitzer, a co-employee who worked with the appellant, the trial judge interrupted the proceedings and called the attorneys to the bench. Following an off the record bench conference, the judge declared a recess and sent the jurors out of the courtroom. The judge then noted that one lady was the first one to have trouble staying awake and noted that she had been "fighting (sleep) for about five minutes" before the judge interrupted. He noted that two other jurors were also having trouble staying awake. The judge stated that he interrupted as soon as the first juror was "just absolutely gone". Although an alternate juror was sitting with the jury, defense counsel did not seek to have any of the drowsy jurors replaced, but insisted on a mistrial.

While such matter may be a ground for a new trial where the objection was promptly raised and prejudice is shown, the fact that a juror was asleep in the jury box during a portion of the trial is not alone ground for a new trial, ... where it appears that accused was not prejudiced. The length of time during which the juror slept and the importance of the evidence, if any, which was taken during this period, may be considered in the motion for a new trial. The mere fact that a juror became drowsy for a short time is not of itself ground for a new trial. 24 C.J.S. (Criminal Law) § 1449(8), p. 116.

An excellent annotation concerning sleeping jurors is found at 88 A.L.R.2d 1275. The cases collected therein reveal that, assuming a sufficient showing that a juror had been asleep during the course of the trial, the courts have universally taken the view that it must be demonstrated that as a result of the lack of attention the juror failed to follow some important or essential part of the proceedings. This determination is primarily one for the trial court's informed discretion. In all of the cases discovered by the annotators, it was held that no prejudice resulted from the inattention.

Among the cases cited in the annotation is *Stone v. State,* 23 Tenn. (4 Humph.) 27, 38 (1843). In that case a number of jury irregularities were charged. Among the al-

legations was one that a juror slept during the testimony in open court for an unascertained period of time. It was also alleged that ardent spirits were drunk by the jury in considerable quantities during the trial. However, the record revealed that the ardent spirits were consumed by the jury at their meals. The Supreme Court observed that:

> In this case the trial was conducted under the inspection of a judge; if eating and drinking or sleeping had disqualified the jury, or a portion of them, from considering the case properly, it would have been his duty to have awarded a *venire facias de novo*. That he did not do so we must, in the absence of proof, come to the contrary conclusion, and hold that these slight irregularities complained of were entirely innoxious to the prisoner.

The transcript of the evidence reveals that the testimony in this case was, by its very nature, quite dull. The jurors were required to listen to hours and hours of testimony concerning the details of numerous transactions in the title insurance business. It should come as no surprise that they become drowsy. Jury service requires activity antithetical to the normal activities of most people. Even in the most sedentary occupations, very few individuals are required to sit and listen for hours on end as numerous questions are propounded and answers given about generally uninteresting matters. However, in the trial of civil and criminal cases, such is often required of laymen. It is one of the miracles of the jury system that they are able to perform this duty day after day in thousands of courtrooms across the Republic and seldom falter in their sworn duty.

■ Here the jurors missed, at the very most, about five minutes of testimony during a three day trial. Testimony concerning the same matters was elicited from other witnesses. Hence, the slight irregularity of having three drowsy jurors and one sleeping was entirely innocuous to the appellant. Since there was no prejudice to the appellant, the refusal to grant a mistrial was not error. This issue has no merit.

We note again that counsel did not seek to have the juror who actually went to sleep replaced with the alternate juror who apparently was awake.

In the next issue the appellant contends that the trial judge erred by allowing two lay witnesses to give their opinions as to the identity of the maker of handwriting specimens without a proper foundation first being laid.

■ Any witness who is familiar with the purported author's handwriting can look at the document and state his opinion that the signature is genuine. There is no requirement that the witness be qualified as an expert. In fact, the authenticating witness need not have ever seen the purported author actually sign his name. He can qualify through having corresponded with the purported author or having done business with him, thereby gaining familiarity with signatures that are in all likelihood genuine. Paine, *Tennessee Law of Evidence*, § 227, p. 243. If the witnesses are familiar with the signature and handwriting of the individual by experience and they are credible witnesses who can testify that the handwriting is that of the accused, that is sufficient. It is a matter for the trial court to determine whether the proof offered by a particular witness qualified him to give testimony regarding the authenticity of the handwriting. *Scott v. Atkins,* 44 Tenn.App. 353, 314 S.W.2d 52, 56 (1957). Although the issue in that case was the authenticity of a holographic will, the principles are the same in criminal cases.

■ The witnesses were employees of the business who had worked with the appellant during her eighteen months tenure. During that time they had observed her writing on numerous documents. One of the witnesses worked in the same department with the appellant and they worked closely together during the time that she was employed in the business. The other witness was a Senior Vice-President, and he too expressed his familiarity with the appellant's handwriting and was able to identify it on numerous documents. Thus, a proper

foundation was laid and the opinions of these lay witnesses were admissible. This issue has no merit.

In the next issue the appellant questions whether the trial judge erred in allowing the prosecutor to cross-examine her character witness concerning the fact that the appellant had filed a bankruptcy petition, and that she had been fired from a previous job at Chattanooga Federal Savings & Loan Association.

■ Any error in permitting the prosecutor to probe the witness' knowledge of the dismissal was waived. There was no contemporaneous objection to this testimony. *State v. Sutton,* 562 S.W.2d 820, 825 (Tenn.1978).

There was an objection to the question concerning the appellant's bankruptcy.

In *Tucker v. State,* 149 Tenn. 98, 257 S.W. 850, 855 (1924), our Supreme Court observed:

> There is, then, a sharp distinction between evidence of the general reputation of a defendant, and evidence of specific acts and conduct which may be developed on cross-examination. The one class of evidence may shed light on the guilt or innocence, the credibility or lack of credibility, of the accused. The other class of evidence must be limited to testing the value of the opinion of the character witness.

In that case a character witness was asked about his knowledge of Tucker's assault on his own brother. The Supreme Court held that such questioning was proper, but continued:

> We are therefore of opinion that the trial judge erred in failing to sharply make before the jury the distinction above pointed out, and in failing to tell the jury that the questions asked on cross-examination were merely for the purpose of testing the accuracy and credibility of the character witnesses, and that the evidence thus developed was not substantive evidence of good or bad character.

■ In this case the trial judge did not give the jury a cautionary instruction about the purpose for which the evidence could be considered. While it is true that, "the prosecutor can easily place in evidence a myriad of prejudicial facts so long as the judge gives the magic instruction", Paine, *Tennessee Law of Evidence,* § 21, p. 20, it was error to fail to give the required instruction.

■ The impeachment of character witnesses is frequently accomplished by asking the witness whether he has heard about prior acts of misconduct that the defendant allegedly committed. *Id.* However, bankruptcy is a legal procedure authorized by the Congress of the United States. 11 U.S.C. § 1 et seq. The mere filing of a bankruptcy petition is no more misconduct than the filing of a suit for breach of contract or an adoption petition, unless filed fraudulently. Even though bankruptcy imparts certain social stigma, it is not evidence of bad character. In the absence of a showing that the bankruptcy was fraudulent, it was error to allow this question to be asked and answered. However, the error did not affirmatively affect the results of the trial on the merits. It was, therefore, harmless. Rule 52(a), T.R.Cr.P. This issue has no merit.

In the next issue the appellant alleges that the trial judge erred in denying his motion for judgment of acquittal on the ground that there was a material variance between the crime alleged in the indictment and the evidence in the case. Specifically, the appellant contends that although indicted for twenty-one counts of embezzlement, the proof at trial constituted the crime of fraudulent breach of trust.

In order to establish the crime of embezzlement by a private employee, the state was required to show in this case that: (1) the appellant was an employee of Title Guaranty & Trust Company; (2) that she received in the course of her regular employment money from another person for her employer; (3) that she fraudulently appropriated the money to her own use; (4) that she acted without authority and with intent to appropriate the money to her own use; (5) she appropriated the money before

it came in the possession of her employer; and (6) the money was valued at over $200.00. TCA § 39–4232, *State v. Knight,* 616 S.W.2d 593, 595 (Tenn.1981), T.P.I.—Crim. § 28.11.

To find the appellant guilty of fraudulent breach of trust, the state would have been required to prove beyond a reasonable doubt: (1) that money was delivered to the defendant, or was in her hands or under her control by reason of her position as clerk or agent for her employer; (2) that she used or disposed of the money; (3) that the use or disposition was unauthorized; (4) that the defendant knew that the use or disposition was unauthorized; and (5) that the money was valued at over $200.00. TCA § 39–4226, T.P.I.—Crim. § 28.09.

■ Thus, it can be seen that embezzlement and fraudulent breach of trust are kindred but distinct offenses. *Nelson v. State,* 208 Tenn. 179, 344 S.W.2d 540, 543 (1960). The embezzlement statute is limited to scope while the fraudulent breach of trust statute is more comprehensive and covers many acts of wrongdoing not embraced in the embezzlement or larceny statutes. *Hill v. State,* 159 Tenn. 297, 17 S.W.2d 913, 914 (1929). Embezzlement requires the receipt of the money directly from a third person and its appropriation before it goes into the possession of the employer. *State v. Matthews,* 143 Tenn. 463, 226 S.W. 203, 205 (1920). The appellant contends that her conviction cannot stand because the money she took was not received directly from a third person, but was already within the possession of her employer.

The proof revealed that the appellant was employed by Title Guaranty & Trust Company, a title insurance company in Chattanooga on July 20, 1978. Based on her prior experience, the appellant went right to work on her employer's computer, with which there had been much difficulty. She was described as being very fast in making entries into the computer.

The company's original records were kept on sequentially numbered guaranty cards which contain virtually all data concerning each transaction with the company. As checks and cash were received, these cards were noted. The transactions were then entered into the computer. If the amounts were paid in cash a receipt was given to the customer. Because of the large number of guaranty cards which were handled in the business from time to time, some cards were misplaced. In that event dummy cards were used until the original cards were found. The dummy cards were given the original numbers borne by the original guaranty cards which they replaced.

In December 1979, Winton Stanley Sweitzer, another employee of Title Guaranty & Trust Company, discovered an original card and a dummy card bearing the same account number but having different payment dates, one being marked July 8, the other being marked July 19. Mr. Sweitzer then looked in the receipt book to determine which was the correct payment date, but could find no receipt at all for this transaction. Based on his familiarity with the appellant's handwriting, he testified without equivocation that she prepared these cards.

Wendell C. Kelley, the Senior Vice-President of Title Guaranty & Trust Company, was alerted and he began checking the company records to determine what the problem was. He found that many transactions were entirely missing from the computer. Apparently, only the appellant knew how to entirely eradicate an entry from the computer. He checked with First Federal Savings & Loan Association, the company's largest customer. From First Federal he obtained copies of checks that had been paid to his company and found that while they had been cashed, the amounts of the checks had not been entered into the company's records. In some instances the transactions had originally been entered into the computer, but then the amount due had been reduced to zero by the use of credit memos to falsely cancel the transactions. However, the practice of the business was to use credit memos only prior to payment, never after an amount had been paid. Rather, rebate and allowance checks

were issued when refunds were to be made. In some instances there were cash transactions where the money was received from the customers, but was never deposited to the company's account. Virtually all documents involved in these transactions were in the appellant's handwriting and bore her initials as the responsible employee. Mr. Kelley testified about 157 transactions totalling $38,817.84, which never went into the account of Title Guaranty & Trust Company.

The proof revealed that Donald H. Eichbaum was the delivery man for Title Guaranty & Trust Company. One of his responsibilities each day was to carry deposits to three or four banks in downtown Chattanooga. When necessary he would get change to bring back for the petty cash fund which amounted to $400.00. This was divided into two funds of $200.00 each. One was kept in the vault. The other was kept in the appellant's desk drawer during business hours. The petty cash fund was used for cashing personal checks, but never for business checks.

The appellant would have Mr. Eichbaum cash checks drawn on First Federal payable to the company and bring back the proceeds allegedly for the petty cash fund. He always brought the pouch containing the money back to the appellant and either handed it to her or put it in her drawer. He never took any money from the petty cash fund himself, nor did anyone ever see the appellant take any of the money.

The proof further showed that this was not the proper procedure for the replenishment of the petty cash fund, but that it was supposed to be replenished with a check drawn on the company.

On December 11, 1979, the appellant was confronted with the numerous discrepancies between the guaranty cards and the computer. She cried and said that she didn't want her father and mother and the girls in her modeling agency to know about it. However, she adamantly denied taking any money and has continued to deny it at the probation hearing. After the confrontation, she hurriedly left the business, carrying with her what appeared to be some of the company's records. However, she returned in a short while, stayed thirty to forty-five minutes and then left again. She was fired that day.

The proof revealed that some of the money was paid directly to the appellant and other amounts were paid to the receptionist who then handed it to the appellant. It is this passage through the hands of the receptionist which forms the basis of the appellant's complaint. She contends that the money was already in the hands of the employer and that, therefore, she could not be guilty of embezzlement.

The receptionist had no responsibility for making entries into the books of the company. She served merely as a conduit through whom the funds passed into the hands of the appellant, who had the responsibility for posting the receipts in the company's records. Checks arriving in the mail were received by her, but were distributed to the appellant for processing. She sometimes received cash when customers paid in that manner. The funds that were taken were never deposited into the general funds of the Title Guaranty & Trust Company, as the appellant was required to do. Even though another employee handled the checks and in some instances the cash prior to the money coming into the possession of the appellant, the funds never came into the possession of the employer because they were never deposited in the employer's account. The overwhelming majority of the questioned transactions were apparently handled entirely by the appellant without any participation by the receptionist, as attested by her handwriting and initials on the receipts and guaranty cards.

The proof revealed embezzlement and not fraudulent breach of trust. Hence, there was no variance between the indictment and the proof. This issue has no merit.

In the next issue the appellant questions whether the trial judge erred by instructing the jury on the presumption of the truthfulness of witnesses. The court charged the jury:

You are the exclusive judges of the credibility of the witnesses and the weight to be given to their testimony. If there are conflicts in the testimony of the different witnesses, you must reconcile them, if you can, and not hastily or rashly conclude that any witness has sworn falsely, for the law presumes that all witnesses are truthful. In forming your opinion as to the credibility of a witness, you may look to the reasonableness of the witness' testimony; to the proof, if any, of general character; the evidence, if any, of the reputation for truth and veracity; the intelligence and respectability of the witness; interest or lack of interest in the outcome of the trial; the witness' feelings; apparent fairness or bias; means of knowledge; appearance and demeanor while testifying; contradictory statements as to material matters, if any are shown; and all the evidence in the case tending to corroborate or to contradict the witness.

This charge has been found to be a correct statement of Tennessee law. *State v. Glebock*, 616 S.W.2d 897, 906 (Tenn.Cr.App. 1981). Furthermore, when considered in conjunction with the other instructions concerning the state's burden of proof and the presumption of innocence, the instruction was fair in every regard. This issue has no merit.

In the next three issues the appellant questions whether the trial judge erred in giving oral supplemental instructions to the jury after they were deadlocked in violation of Rule 30, T.R.Cr.P.; whether the supplemental instruction given to the jury constituted an *Allen* or dynamite charge; and whether the court erred in giving an oral supplemental instruction without admonishing the jury not to place undue emphasis on the supplemental instruction.

After deliberating for a time, the jury returned into court with a question about the appellant's signature and initials on the credit memos and the guaranty cards. The trial judge held a bench conference with the attorneys off the record and then repeated the instruction that the jury is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. Contrary to the appellant's allegation that they were deadlocked, the foreman responded that the jury was making progress and wanted to return to the jury room rather than be respited for the day. The foreman then asked if they could have the oath which they took when they were sworn as jurors repeated. Again the trial judge called the lawyers to the bench where a conference was held off the record. The trial judge then repeated the oath which the jurors took at the beginning of the trial as follows:

> Do you and each of you solemnly swear or affirm that you will well and truly try this issue in which the State of Tennessee is the plaintiff and Rosa Chestnut is the defendant and a true verdict render, according to the law and evidence, so help you God?

After the oath was repeated, the jurors returned to the jury room and continued with their deliberations. Defense counsel then restated for the record the objection that he made at the unrecorded bench conference, contending that the repetition of the oath had the same effect as an *Allen* charge or a dynamite charge.

 In her first attack the appellant contends that the oath was a supplemental instruction which should have been reduced to writing in order to comply with Rule 30(c), T.R.Cr.P.

In *Taylor v. State*, 212 Tenn. 187, 369 S.W.2d 385, 388 (1963), our Supreme Court held that "(t)he charge or instruction required by law to be reduced to writing is only that which the court may have to say to the jury in regard to the principles of law applicable to the case and to the evidence". The repetition of a juror's oath, while unusual, did not amount to a jury instruction as defined in *Taylor*. Therefore, there was no requirement that it be reduced to writing. This issue has no merit.

Finding that the mere repetition of the oath was not an "instruction", we further find that it did not amount to an impermis-

sible *Allen* [*v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)] or dynamite charge condemned in *Kersey v. State,* 525 S.W.2d 139, 144 (Tenn.1975). Further, since it was not an instruction, it was unnecessary for the trial judge to instruct the jury as to how to consider the supplemental charge as contemplated in *Leach v. State,* 552 S.W.2d 407, 408 (Tenn.Cr.App.1977). These issues have no merit.

In the next issue the appellant contends that the trial judge erred in not giving proper supplemental instructions to the jury on the issue of the identification of the appellant's handwriting by the lay witnesses after the jury requested additional instruction on the issue and the appellant submitted a special request.

The special request submitted by the appellant was as follows:

> Ladies and Gentlemen of the jury: Witnesses, Sweitzer and Kelley, were allowed to testify for the prosecution that in their opinion the signature on the credit memos and guaranty cards were that of the defendant. The fact that the court allowed said opinion testimony does not mean that the jury has to accept said testimony as being true. The question of whether to accept or reject said testimony is solely within the province of the jury.

The trial judge repeated the instructions previously given as follows:

> Members of the jury, the jury is the exclusive judges of the facts and the credibility of the witnesses and the weight to be given their testimony. It is for the jury to decide whether to accept or reject any evidence brought before them.

The instruction given was a full and accurate statement of the law. When the instructions given, fully, fairly, and accurately state the law, there is no requirement that specially requested instructions be given. *Edwards v. State,* 540 S.W.2d 641, 649 (Tenn.1976). This issue has no merit.

In the next issue the appellant presents the standard issue challenging the sufficiency of the evidence.

A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978).

The state's evidence was as heretofore recited. The appellant did not testify, but presented one character witness. Based on this largely uncontroverted proof, the jury was clearly justified in finding the appellant guilty of embezzlement beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). This issue has no merit.

In her final issue the appellant contends that the trial judge abused his discretion in denying her petition for a suspended sentence. She testified in her own behalf and presented three character witnesses.

George Key, a building contractor who built the appellant's home, is a former probation officer for the State of Tennessee and president of the local chapter of the National Association for the Advancement of Colored People (NAACP). Having known the appellant for approximately ten years, Mr. Key opined that she would comply with the rules and regulations of probation.

Mrs. M. Sheffield Smartt, a retired school teacher, had known the appellant since she was a high school student. It was her opinion that if placed on probation the appellant would do exactly as requested.

The appellant's husband of eleven years testified that his wife had no prior criminal record and that she was fired from Chattanooga Federal because of racial discrimination, resulting in a lawsuit being filed against that company. As one might expect, he testified that she was a good candidate for probation.

Testifying in her own behalf, the appellant maintained her innocence. She outlined her employment record at American National Bank, First Tennessee Bank, Chattanooga Federal, and Kayo Oil Company. She denied being fired by Chattanooga Federal for shortage in her cash fund and high absenteeism, claiming that she resigned because of racial discrimination and physical abuse. She admitted that she was fired by Kayo Oil Company for unsatisfactory work performance. However, she claimed the poor work record resulted from constant complaints from white co-workers about her body odor. After her stint with Title Guaranty & Trust Company, the appellant worked for the Teamsters Union for about a month, but resigned after being accused of misusing her employer's equipment. She also recounted her volunteer work with Elite Fashions and admitted filing a bankruptcy petition.

The trial judge denied probation, citing as reasons for the denial: (1) the circumstances of the offense; (2) the extensiveness of the criminal activity; (3) the appellant's work record; and (4) to some extent, her refusal to admit her guilt.

 A denial of probation will not be reversed on appeal unless the trial court's decision was arbitrary, capricious, or a palpable abuse of discretion. *Stiller v. State,* 516 S.W.2d 617, 620 (Tenn.1974). In order to find such an abuse of discretion, it must be demonstrated that the record contains no substantial evidence to support the conclusion of the trial judge, giving due consideration to the statutory criteria set forth in TCA § 40–2904, and the decisions of our Supreme Court. *State v. Grear,* 568 S.W.2d 285, 286 (Tenn.1978). These criteria include: (1) the circumstances of the offense; (2) the petitioner's criminal record; (3) her social history; and (4) her present condition, including her physical and mental condition where appropriate. The trial judge may deny probation upon the ground of the deterrent effect upon other criminal activity. TCA § 40–2904(a)(1).

 A defendant's truthfulness and repentance are permissible factors for the judge's consideration, along with other factors, but probation may not be denied solely because the trial judge does not believe the denial of guilt. *State v. Gautney,* 607 S.W.2d 907, 910 (Tenn.Cr.App.1980). In this case the trial judge placed some emphasis on the appellant's lack of repentance, but indicated other factors entered into his decision to deny probation.

The appellant's poor work record is a portion of her social history and was a proper factor for the judge's consideration.

In *State v. Travis,* 622 S.W.2d 529, 534 (Tenn.1981), the Supreme Court held that if probation is to be denied because of the nature of the offense, it must be clear that the criminal act, as committed, would be described as especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree.

 In this case the appellant's derelictions consisted of embezzlement of almost $39,000.00 in at least 157 separate transactions spanning the period from February to December 1979. She was able to accomplish this because she was entrusted by her employer to work as bookkeeper. This is especially reprehensible and offensive. These were crimes of an excessive or exaggerated degree.

All of the factors properly cited by the trial judge point against probation. Therefore, there was substantial evidence to support the trial judge's denial of a suspended sentence. Hence, there was no abuse of discretion, and this issue has no merit.

Finding all of the issues devoid of merit, the judgment is affirmed.

WALKER, P.J., concurs.

DAUGHTREY, J., concurs in result.