IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 13, 2010

**STATE OF TENNESSEE v. DEVARON TAYLOR**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-01054    James M. Lammey, Jr., Judge**

_____

**No. W2009-01252-CCA-R3-CD  - Filed September 12, 2011**

_____

Defendant, Devaron Taylor, was indicted by the Shelby County Grand Jury for two counts of felony murder and one count each of aggravated burglary and attempt to commit especially aggravated robbery.  Prior to trial, one count of felony murder was dismissed on motion of the State.  Following a jury trial, Defendant was convicted of felony murder, attempt to commit especially aggravated robbery, and aggravated burglary.  Defendant was sentenced to life imprisonment for his felony murder conviction and concurrent sentences of eight years for attempted robbery and three years for aggravated burglary for an effective sentence of life imprisonment.  In this appeal, Defendant raises the following issues for our review: 1) whether the trial court erred by refusing to grant a mistrial after a juror was dismissed for sleeping; 2) whether the trial court erred by failing to restrict the State's use of a hypothetical fact pattern during voir dire and by limiting Defendant's voir dire.  After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Taylor Eskridge and Larry Copeland, Memphis, Tennessee, for the appellant, Devaron Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Ray Lapone, Assistant District Attorney General; and Collin Campbell, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

## *Facts*

On September 25, 2007, shortly after 5:00 p.m., Barbara Mathis was at her home when someone told her that the victim, Maurice Pegues, an elderly man who lived down the street from her, might be dead. She went to Mr. Pegues' house and saw him lying on the ground. Ms. Mathis testified that the victim appeared to still be breathing and was holding his side. She saw latex gloves and keys on the ground beside him, and his pants pocket was inside out.

Jason Berry, a Memphis Fire Department paramedic, responded to a call to the victim's home. When he arrived, he saw the victim lying on his left side in the grass beside the house. The victim had two gunshot wounds, and he was deceased. Mr. Berry testified that he arrived on the scene at 5:39 p.m., and he estimated that the victim had died two hours prior to him arriving.

Memphis Police Department Officer Richard Simes responded to a call to the victim's residence. When he arrived at around 5:30 p.m., he found the victim deceased, lying in the front yard. He observed a broken window at the back of the house. Officer Simes did not find any fired ammunition near the victim's body.

Officer Marlon Wright responded to the scene between 6:00 and 7:00 p.m. The victim had been shot and was dead upon Officer Wright's arrival. He testified that the victim had been lying on top of a pair of latex gloves. Believing that the gloves were left behind by the paramedics, they were folded up inside a sheet used to cover the victim's body and thrown in a trash can behind the victim's house. The gloves were later recovered as evidence by Sergeant Anthony Mullins.

On the day after the shooting, Officer James Max of the Memphis Police Department recovered from inside the victim's home a work glove that was lying on the victim's bed, a piece of duct tape that was stuck to the dresser, a magazine, and an extension cord, all of which he sent to the lab for fingerprinting. Donald Carpenter processed those items for fingerprints, and he was able to lift a ridge detail from the roll of duct tape only. Carpenter also examined other items recovered from inside the house and around the victim's house, including a garbage can, the window glass, a wooden board, and one of the latex gloves found under the victim's body, but he was unable to find fingerprint ridge details on any of those items. Larry Preston, a latent print examiner, compared the fingerprint lifted from the roll of duct tape with Defendant's fingerprint and concluded the prints matched identically.

Qadriyyah Debenam, a forensic scientist for the TBI, analyzed several items of evidence submitted by the police department, including fingernail scrapings taken from the victim, a blood sample taken from the victim, the latex gloves, and the victim's pants and belt. She was unable to obtain a DNA profile sufficient for testing from the latex gloves. She compared the DNA taken from the other items submitted to the Defendant's DNA profile and concluded that there was no match.

William Milam was interviewed by police as a possible suspect in this case. He testified that he lived one street away from the victim and that he was Defendant's best friend. He knew Mr. Pegues as "the old man in the neighborhood." He testified that he and others would do chores for Mr. Pegues and that Mr. Pegues would "help [them] out." Milam gave two statements to the police. In one of those statements, Milam stated that Defendant told him he and Alvin Gordon had killed the victim. On the day of the shooting, Defendant went to Milam's house around 3 or 4:00 in the afternoon. Defendant told Milam that Alvin Gordon had shot the victim. Defendant asked Milam to move a rifle and a shotgun for him. Milam found the guns where Defendant told him he had left them and put them in a garbage can in front of an address on the same road where he lived. Sergeant Bart Ragland recovered a 12-gauge shotgun and .22 caliber rifle from a garbage can at the same address.

Sergeant Joe Stark interviewed Defendant on September 26, 2007. Defendant and his mother went to the police department voluntarily, and they both signed a waiver of rights form. Defendant initially denied any involvement. Defendant then told detectives that he had heard the gunshot but was not present at the shooting. Finally, Defendant told detectives that he was with Alvin Gordon when Gordon shot the victim. In his statement, Defendant told police that Gordon had asked him if he wanted to "get the old man," to which Defendant responded that he "didn't care." Together they went to the victim's house, where Gordon removed the glass from a window in the rear of the house, and they both entered the house. They found a 12-gauge shotgun and shells. Defendant stated that Gordon found some duct tape and suggested they tie up the victim when he came home. When the victim arrived home, he came around to the back window, and Gordon pulled out a .38 caliber handgun and shot the victim. Defendant took the shotgun and ran away. Before running away, he saw Gordon go over to the victim and take something black out of his pocket. He threw the shotgun into the bushes. Defendant stated that the original plan was to wait for the victim to return home and that they had intended to take his car.

Defendant testified that on September 25, 2007, he woke up around 11 or 12:00 and walked to Magnolia, the area in which the victim lived. Alvin Gordon called him and asked, "Do you want to get the old man's car?" Defendant replied that he "didn't care." Defendant walked to Gordon's house, and together they walked to William ("Eddie") Milam's house, but no one answered the door at Milam's house. Defendant and Gordon then walked to the

victim's house. Defendant testified that Gordon used a screwdriver to "pop" the window out and used a trash can to step up and go inside through the window. Gordon looked around inside and told Defendant that no one was there, and Defendant went inside. Inside the victim's house, they found a 12-gauge shotgun. Defendant testified that Gordon handed him the shotgun, he handed it back, and Gordon put the shotgun down on the bed beside the window. Gordon also found some 12-gauge shotgun shells, which he also placed on the bed.

Defendant testified that he searched the house, looking for the victim's car keys. Defendant found latex gloves in the bathroom and he put them on so as not to leave fingerprints, and he and Gordon continued to look for the car keys. They did not find any car keys, and Defendant looked through the victim's dresser. He testified that Gordon appeared with duct tape and asked if he wanted to "tie [the victim] up." Defendant told Gordon, "No, we just came to get the keys to the car." Defendant took the duct tape from Gordon and placed it on the dresser. Defendant told him that he thought "things [were] getting out of hand." Defendant took off the gloves and began to leave. Gordon told Defendant to wait, and Defendant went back to the front of the house to wait. Then, they saw the victim returning home. Defendant testified that the victim came to the back of the house where Defendant and Gordon were standing and pulled back the curtain. The victim called Gordon by name, and Gordon pushed Defendant aside, pulled out a gun and shot the victim. Defendant grabbed the shotgun and they both jumped out of the window and ran. As they ran away from the victim's house, Defendant saw Gordon reach down and take something from the victim's pocket. Defendant threw the shotgun into the bushes. They then walked to William Milam's house. Defendant later told Milam to get the shotgun out of the bushes.

Defendant admitted that he went to the victim's house to steal his car and that they waited on the victim to arrive home. Defendant and Gordon stole $9.50 in quarters from the victim. Defendant heard the victim gagging as he ran away from the home. Defendant explained how he believed that the latex gloves he was wearing were found lying under the victim's body. He testified that he had taken the gloves off, and the victim took them from him when he was standing at the window before he was shot. On direct examination, Defendant denied knowing in advance that Gordon had a gun with him that day, but he later admitted on cross examination that he did, in fact, know that Gordon possessed a gun.

*Analysis*

Defendant first contends that the trial court erred by not granting a mistrial after the court dismissed one of the original jurors for sleeping. The State responds that Defendant has waived this issue by failing to object or request a mistrial at the time of the court's removal of the juror.

-4-

During the State's case-in-chief, defense counsel brought to the court's attention during a sidebar that one of the jurors had been sleeping during the witnesses' testimony. The trial court suggested to the jury at the end of that day's proceedings that they all "get a good night's sleep." The following day, during a recess, the trial court again noted the sleeping juror and proposed that he be dismissed and replaced by an alternate juror. Defense counsel noted that the juror was distracting to the other jurors, and both attorneys agreed to dismiss that juror.

The State argues that this issue is waived and should therefore be subject only to a plain error analysis. When a defendant fails to make a contemporaneous objection and fails to raise an issue in his motion for new trial, the issue is waived and may only be reviewed in accordance with the plain error doctrine. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Defense counsel did not object to the replacement of the sleeping juror at trial, nor did he request a mistrial. In fact, defense counsel acquiesced to the trial court's action to replace the juror. Despite the fact that Defendant raised this issue in his amended motion for new trial, it is waived due to the fact that Defendant acquiesced in the procedure and thus obviously failed to object and to ask for a mistrial. Even if not waived, the issue is without merit.

Once a jury is impaneled, jurors may be discharged from further service prior to deliberations only if found by the trial court to be "unable or disqualified to perform their duties." Tenn. R. Crim. P. 24(f); *see* Tenn. Code Ann. § 22-5-312. The decision to discharge a juror and to select an alternate juror is left to the discretion of the trial judge. *State v. Millbrooks*, 819 S.W.2d 441, 445 (Tenn. Crim. App. 1991).

Defendant urges this Court to follow the reasoning in *State v. Cleveland*, 959 S.W.2d 548 (Tenn. 1997) and *State v. Chestnut*, 643 S.W.2d 343 (Tenn. Crim. App. 1982). In *Cleveland*, the Tennessee Supreme Court found plain error where the trial court replaced a missing juror with an alternate juror, and when the missing juror later appeared during closing argument, the trial court replaced the alternate juror with the original missing juror. *Cleveland*, 959 S.W.2d at 550. Finding that "the error so fundamentally prejudice[d] the judicial process," the Court declined to review the issue for harmless error and reversed the defendant's conviction. *Id*. at 552. The supreme court distinguished that case from the facts of *Chestnut*, in which this court found no prejudice to the defendant where a juror had been sleeping and missed five minutes of testimony. *Id*. In *Chestnut*, defense counsel did not request that the sleeping juror be replaced with an alternate, but rather moved for a mistrial. *Chestnut*, 643 S.W.2d at 346. This court considered the length and nature of the testimony missed by the sleeping juror, noting that the juror missed only five minutes of testimony in

a three-day trial and that the testimony "was, by its very nature, quite dull." *Id*. at 347.

Unlike both *Cleveland* and *Chestnut*, in the present case the deliberating jury did not include a juror who missed any portion of the proceedings. The sleeping juror was replaced by an alternate who was present for all of the proceedings. Defendant is not entitled to relief on this issue.

In his next issue, Defendant contends that the trial court failed to restrict the State's use of hypothetical questions during voir dire and that the trial court improperly limited defense counsel's voir dire. Defendant asserts that the trial court abused its discretion by allowing the State to use fact patterns similar to the facts in the present case to "solicit[ ] a promise from the jury in violation of Tennessee law." Defendant further asserts that he was prejudiced when the trial court restricted his questioning of the jurors regarding the natural and probable consequences rule.

"The ultimate goal of voir dire is to [e]nsure that jurors are competent, unbiased, and impartial. . . ." *State v. Cazes*, 875 S.W.2d 253, 262 (Tenn. 1994). The appellate courts in this State have determined that it is improper to ask prospective jurors hypothetical questions that seek to commit the jurors to a specific course of action. *Solomon v. State*, 489 S.W.2d 547, 550 (Tenn. Crim. App. 1972). The trial court has wide latitude in conducting the examination of prospective jurors, and its decision will not be disturbed unless there is an abuse of the court's discretion. *State v. Irick*, 762 S.W.2d 121, 125 (Tenn. 1988); *State v. Black*, 618 S.W.2d 526, 527 (Tenn. Crim. App. 1981).

During voir dire, the State posed a hypothetical to the prospective jurors in which four individuals, a driver, a planner, a lookout, and a gunman, rob a bank. The prosecutor asked the jurors whether they believed that the driver, the planner, and the lookout could be found guilty of the aggravated robbery under the theory of criminal responsibility for the acts of the gunman. The prosecutor then asked whether those individuals could be found guilty of murder if the gunman killed someone in the course of the robbery. The prosecutor asked prospective jurors whether they understood the law and whether they felt comfortable following the law as explained to them by the trial judge.

Our review of the record shows that the State did not, in posing its hypothetical to the jury, ask for a commitment from the prospective jurors. We therefore conclude that the trial court did not abuse its discretion.

Lastly, Defendant asserts that the trial court improperly limited his voir dire of the prospective jurors. Using the State's bank robbery example, defense counsel asked prospective jurors whether any of the other three individuals besides the gunman would have

been guilty by the natural and probable consequences of the gunman's actions if the other three did not know that the gunman had a gun. The State objected. During a bench conference, defense counsel argued that the rule was an element of criminal responsibility that the State was required to prove, and the State argued that the rule of natural and probable consequences does not apply to felony murder, and therefore, defense counsel had misstated the law to the jury. The trial court agreed with the State, finding that defense counsel's use of the natural and probable consequences rule in the hypothetical was misleading to the jury. Following the bench trial, the trial court properly instructed the jury on the elements of felony murder.

This court, in *State v. Winters*, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003), explained that "the felony murder statute . . . does not require that a homicide committed during the course of one of the enumerated felonies be foreseeable." In other words, "'[w]hen one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other.'" *Id*. (quoting *State v. Hinton*, 42 S.W.3d 113, 119 (Tenn. Crim. App. 2000)).

We conclude that the trial court did not abuse its discretion by limiting defense counsel's voir dire. The trial court instructed the jury as to the natural and probable consequences rule as an element of criminal responsibility. However, in the context of felony murder, the trial court was correct in limiting defense counsel's voir dire so as not to confuse the jury. We note that defense counsel's voir dire was limited only as to the charge of felony murder and not the other two charges. Moreover, Defendant has not established how he was prejudiced by the court's ruling. This issue is without merit.

## CONCLUSION

Finding no error, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-7-