IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2017 Session

## STATE OF TENNESSEE v. JAQUAN GATHING and PRINCE PARKER

**Appeal from the Criminal Court for Shelby County**
**No. 14-03635          James C. Beasley, Jr., Judge**

———————————————

**No. W2016-02076-CCA-R3-CD**

———————————————

The Defendants, Jaquan Gathing and Prince Parker, were convicted of various offenses in connection with the robbery and assault of three victims committed with firearms and a hatchet. Mr. Gathing was convicted of attempted especially aggravated robbery, aggravated assault, facilitation of aggravated assault, facilitation of attempted aggravated robbery, and especially aggravated robbery, and he received an effective sentence of forty-seven years. Mr. Parker was convicted of facilitation of attempted especially aggravated robbery, facilitation of aggravated assault, facilitation of attempted aggravated robbery, and facilitation of especially aggravated robbery, and he received an effective sentence of twenty-six years. On appeal, Mr. Gathing relies on his brief and oral argument and challenges: (1) the trial court's denial of his motion to suppress; (2) improper comments made by the State during voir dire; (3) the insufficient chain of custody for DNA evidence; (4) improper comments made to the jury regarding the merger of offenses; and (5) the State's failure to preserve the record for appeal. On appeal, Mr. Parker relies on his brief and challenges: (1) the sufficiency of the evidence to support his convictions; (2) the admission of a photograph of an alleged victim's injuries; (3) the trial court's application of enhancement factors to his sentences; and (4) the trial court's decision to run his sentences consecutively. After review of the record and applicable law, we affirm the judgments of the trial court but remand for entry of corrected judgments of Prince Parker to reflect facilitation of aggravated assault with a deadly weapon, rather than with serious bodily injury, and to reflect the proper classification of facilitation of especially aggravated robbery as a Class B felony, rather than a Class C felony.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Terrell L. Tooten, Cordova, Tennessee, for the appellant, Jaquan Gathing.

Jennifer J. Mitchell, Memphis, Tennessee, for the appellant, Prince Parker.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Ann Schiller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The Defendants, along with two co-defendants who are not parties to this appeal, committed a brutal attack on Mr. Eric Cain, Ms. Myisha White, and Mr. Deangelo Terry (collectively "the victims") as part of a robbery on March 13, 2014. In the course of the robbery, the perpetrators took the victims' clothing and personal property and inflicted injuries on the victims with a hatchet and by hitting them with firearms. The crimes were interrupted by the arrival of police, who apprehended all four perpetrators that night. The Defendants were both charged with one count of attempted first degree murder of Mr. Cain, one count of attempted especially aggravated robbery of Mr. Cain, two counts of aggravated assault of Mr. Cain while acting in concert with two or more persons, one count of aggravated robbery of Mr. Rico Johnson, one count of attempted first degree murder of Ms. White, one count of attempted aggravated robbery of Ms. White, two counts of aggravated assault of Ms. White while acting in concert with two or more persons, one count of attempted first degree murder of Mr. Terry, and one count of especially aggravated robbery of Mr. Terry.

On March 13, 2014, Mr. Cain, Ms. White, Mr. Terry, and Mr. Johnson were visiting at the apartment of Ms. Danneisha Stinson. At around 2:00 or 3:00 a.m., the victims and Mr. Johnson went outside into the parking lot to look for the key to Mr. Terry's vehicle when they were attacked. Mr. Cain testified that there were two attackers, Ms. White testified that there were three attackers, and Mr. Terry testified that there were three attackers. Ms. Stinson observed the attack from her upstairs window and testified that there were three or four attackers. The victims testified that the attackers were wearing masks and bandanas.

Using a sawed-off shotgun, a pistol, and a hatchet, the attackers forced Mr. Cain, Ms. White, and Mr. Terry to the ground and instructed the victims to take off their clothes and "to give [the attackers] what they had." The attackers "snatched" the clothes off of Mr. Cain. Mr. Cain saw the attackers "torture" Mr. Terry and Ms. White. Mr.

Cain was hit repeatedly, and his face was slammed into the ground, knocking him unconscious. Mr. Terry was hit in the head with the hatchet before passing out. Ms. White watched as Mr. Terry and Mr. Cain were "brutalized" before the attackers did the same to her. The attackers picked up Mr. Cain, threw him on top of Mr. Terry, and said they were going to kill them. Upon hearing police sirens, the attackers ran away with the items they took from the victims.

Ms. Stinson was still in the upstairs apartment when the attack occurred. From her window, Ms. Stinson saw Mr. Terry, Mr. Cain, and Ms. White lying on the ground in the parking lot and the attackers beating the victims with a gun and "a long metal object like a knife." The attackers "were swinging a long metal object back and forth, and you could hear it hit." She heard a gunshot, and she was "scared" and "panicking." She tried to call 9-1-1 on Ms. White's tablet, but was unsuccessful in her attempts.

During the attack, Mr. Johnson came back upstairs and knocked on Ms. Stinson's door. Ms. Stinson let Mr. Johnson inside, and he also tried to call 9-1-1. After Mr. Johnson went back outside, the victims came upstairs. Ms. Stinson testified that Ms. White had stab wounds to the head, Mr. Cain had "blood and chunks of meat everywhere," and Mr. Terry was unconscious on the living room floor. An officer responding to the scene described Mr. Cain as having "his ear hanging off" and described Mr. Terry's head, neck, and collar bone area as "chopped up." Mr. Terry was put on oxygen and was going in and out of consciousness. The victims and Mr. Johnson were all transported to the hospital for treatment for their wounds.

Officer Wayne Greygor of the Memphis Police Department responded to a call about the robbery in progress at approximately 3:00 a.m. When entering the apartment complex, Officer Greygor turned the direction normally used as an exit, believing that the attackers would come from that direction if they attempted to leave the apartment complex. He saw a gold or beige sport utility vehicle ("SUV") coming toward him. It stopped and turned its headlights off. Officer Greygor pulled to the side and turned his headlights off, as well. After about thirty seconds, the SUV's headlights turned back on, and it started to drive toward Officer Greygor. He then turned on his headlights and activated his blue lights, pulling into the middle of the road in an attempt to block the vehicle from leaving. The SUV went around Officer Greygor and kept going, so Officer Greygor turned around and followed it.

While Officer Greygor was following the SUV, he saw a black male wearing dark clothing jump out from the front passenger door. The man was described as "about the same size" as Defendant Prince Parker. As the man jumped, a mask and green bandana were dropped or thrown from the car. Officer Greygor continued to follow the SUV until another patrol car stopped the SUV from the front. The two officers ordered everyone

- 3 -

out of the SUV at gunpoint and detained them. Co-defendant Danielle Brown was driving the SUV at the time. Defendant Jaquan Gathing and Co-defendant Morgan Edwards were both in the back seat. Mr. Parker was not in the vehicle at the time.

While Mr. Gathing, Mr. Edwards, and Ms. Brown were each being detained in separate patrol cars, Mr. Parker walked up to the officers on the scene. He informed the officers that Ms. Brown was his girlfriend and that the SUV belonged to him. Mr. Parker told Sergeant Clifton Dupree that he had asked Ms. Brown to drive his two friends around "to do whatever." Mr. Parker said his sister told him that she had seen his vehicle pulled over while she was driving by the area. Mr. Parker had come outside to the scene to see if that was true.

Officer Greygor testified that Mr. Parker tried to give the officers information in an effort to "barter" for Ms. Brown's release. Sergeant Dupree testified that Mr. Parker stated that "one of his friends had [a] Tec-9 and one of them had a shotgun." He told the officers that a work hatchet was used on the victims, that the shotgun for which the officers were searching was located inside the SUV, and that the Tec-9 was normally stored under the seat in the vehicle. As the officers at the scene with the SUV received information from the officers at the scene of the attack, they realized that Mr. Parker had very specific information that would not have been known to somebody who was not involved in the robbery. Mr. Parker was eventually taken into custody and charged along with the three occupants of the vehicle.

After the Defendants had been arrested, Sergeant George Cave overheard a discussion between Mr. Gathing and Mr. Parker, who were in separate rooms with an adjoining wall between them. They attempted to speak to each other through the wall, and Sergeant Cave heard Mr. Parker "saying something to the effect [of], 'Don't tell them anything,' and Mr. Gathing saying something to the effect of, 'I didn't tell them anything, I didn't tell them nothing.'" The two Defendants were later moved away from each other.

The SUV was towed to the Crime Scene Office and searched pursuant to a search warrant. The items found inside the SUV included a sawed-off shotgun with duct tape wrapped around the handle, a Tec-9 pistol, a magazine for the Tec-9 containing thirteen rounds, a yellow shotgun shell, what appeared to be a bloodstain on the inside of the passenger door, a pair of bloody latex gloves, a dollar bill with blood on it, a red bandana, a "skull cap," a wallet, various articles of clothing, and two pairs of tennis shoes.

During the trial, Ms. Brown, a co-defendant, testified on behalf of the State that she was Mr. Parker's girlfriend at the time of the attack. Prior to the attack, Mr. Parker had told Ms. Brown that he knew some people who had "a lot of money and weed" and

that he planned to rob them. Mr. Parker drove his SUV to the apartment complex, with Ms. Brown in the front passenger seat and Mr. Edwards and Mr. Gathing in the back seat. They pulled to the back of the complex and parked. Mr. Parker and Mr. Gathing put masks and bandanas over their faces and got out of the vehicle while Ms. Brown remained in the vehicle with Mr. Edwards. Although Ms. Brown was aware of the two guns in the vehicle, she did not see Mr. Parker or Mr. Gathing leave with the weapons. Ms. Brown moved to the driver's seat to play with the radio while Mr. Gathing and Mr. Parker were gone. She testified that they were gone for thirty minutes to an hour before returning to the vehicle. Upon their return, they were "calm," and there was "no screaming" and "no excitement." Mr. Parker got into the front passenger seat and told Ms. Brown to drive. Ms. Brown did so but stopped the vehicle when she saw police cars in front of her. When the car was stopped, Mr. Parker got out of the vehicle and jumped over a gate. Ms. Brown testified that when Mr. Parker returned to the scene after she had been placed in a patrol car, he was wearing different clothes than he was wearing during the robbery.

Ms. Brown acknowledged that she provided false information in her statement to the police on the day of the attack. She had previously identified Mr. Gathing and Mr. Edwards but had claimed the occupant who jumped out of the car was named Kevin Ward. Ms. Brown explained at trial that before the robbery occurred, Mr. Parker had instructed Ms. Brown to give the name Kevin Ward, which was his alias, in the event they were caught. Ms. Brown testified that she did not know that the victims were going to be "chopped up," that she had never been arrested before, and that she was "scared" and "shocked" when the police showed her photographs of the victims' injuries.

Ms. Brown also testified to a conversation she had with Mr. Parker while they were both incarcerated. Mr. Parker had hidden in the bathroom, unbeknownst to Ms. Brown. When Ms. Brown entered the bathroom, Mr. Parker asked Ms. Brown not to testify against him. Although Ms. Brown did not initially report the encounter, she later told her attorney about the conversation.

The victims each testified to injuries sustained in the attack. Mr. Cain testified that he remembered waking up in the hospital with a "[b]roken jaw, wound to the back of the head, a cut up ear, beat up knees, bruised ribs," and a cut around his eye that was still leaking fluid into his eye at the time of trial. His ear had to be reattached, and he remained in the hospital for a week. Although Ms. White did not take off her clothes after being told to do so by her attackers, she remembered waking up in the hospital wearing only her "boxers and a wife beater." She had bruised ribs from being kicked and two stab wounds in the back of her head, and she remembered being knocked out with a "big gun." Mr. Terry remembered being hit in the head, "knock[ing] some of [his] dreads

out." He had cuts to his hand from attempting to protect his head during the attack. He also testified at trial that he still suffered from headaches from the attack.

At trial, Mr. Cain identified a jacket, a pair of sweatpants, and a lighter with a shoe string tied around it as the items taken from him during the attack. These items were found in the SUV during the execution of the search warrant. He identified a pair of shoes found in the SUV as the shoes Mr. Terry was wearing the night of the attack. He identified his cellular phone found in the parking lot where the attack occurred. He identified the pistol as the gun with which he was hit. He also identified the sawed-off shotgun as the shotgun with which an attacker hit Mr. Terry across the face. Mr. Cain identified the mask that fell out of the vehicle when Mr. Parker jumped out as the mask that one of the attackers was wearing. He further described the attacker as wearing a green bandana and having "dreads," which was the hairstyle Mr. Parker wore at the time.

Ms. White identified a pair of tennis shoes found in the SUV as looking similar to the ones she was wearing the night of the attack. She agreed that in her initial statement to the police, she described one of the attackers as having "long dreads."

Mr. Terry identified a pair of pants found in the SUV as the ones he was wearing during the robbery. He also identified his wallet, photo identification, and cellular phone, all of which were found in the SUV.

Special Agent Donna Nelson of the Tennessee Bureau of Investigation ("TBI") provided expert testimony regarding DNA testing of some of the items found in the SUV and at the scene of the attack. Mr. Parker's DNA was found on the nose and mouth area of the ski mask that fell out of the car while Officer Greygor was following it. Ms. White's DNA was found in a sample taken from a bloodstain from the inside door of the SUV. The "skull cap" found in the SUV contained Mr. Gathing's DNA, and one of the gloves from the SUV contained Mr. Edwards's DNA. The tennis shoes Mr. Gathing was wearing the night of the incident had both Mr. Gathing's DNA and Ms. White's DNA on them. A bloodstain on Mr. Gathing's pants from that night had DNA from both Mr. Gathing and Mr. Cain.

Special Agent Kasia Lynch from the TBI's Firearms Identification Unit provided expert testimony regarding the firearms and ammunition found at the scene of the attack and in the SUV. She identified the pistol as an Intratec Tec-9, 9 millimeter Luger pistol. She concluded that the pistol was inoperable due to a missing firing pin. She determined that the thirteen unfired, 9 millimeter Luger cartridges, which were found in the magazine in the SUV, would be the proper size to fire from the pistol. Special Agent Lynch identified the shotgun as a New England Firearms, Pardner SB1, 20 gauge sawed-off shotgun. She concluded that the shotgun was operational and that the fired shell case

- 6 -

found at the scene of the attack had been fired from the shotgun. She also concluded that the unfired shell from the SUV and the unfired shell from the scene of the attack were both the correct gauge to be fired from the shotgun.

Although Mr. Johnson was treated for his injuries and included as an alleged victim in the indictment and throughout the trial, the evidence at trial did not establish that his injuries were caused by the attack. The other three victims testified that Mr. Johnson went outside with them. Since Mr. Johnson was the last to come out of the apartment and down the stairs, he was walking behind the other three victims when the attack occurred. None of the other victims saw Mr. Johnson at any time during the attack. It was not established at trial how much time elapsed between the time the attack began and the time Mr. Johnson went upstairs to Ms. Stinson's apartment. Likewise, there was no testimony as to his location during that time.

Ms. Stinson testified that Mr. Johnson had been in an altercation with another individual in the apartment complex before the robbery occurred. She further testified that when Mr. Johnson came back upstairs to her apartment during the robbery, he looked the same as he did after the altercation. When shown the photograph taken of Mr. Johnson's injuries while he was in the hospital, Ms. Stinson testified that his injuries appeared the same as they did after the altercation and before the robbery. Mr. Johnson was unable to be located during the investigation, his DNA sample was never retrieved to be used as a standard in the testing performed by the TBI, and he did not testify at trial. At the end of the State's proof, the trial court entered a directed verdict in favor of both Defendants as to the aggravated robbery committed against Mr. Johnson.

The jury found both Mr. Gathing and Mr. Parker not guilty of all three counts of attempted first degree murder. The jury found Mr. Gathing guilty of one count of attempted especially aggravated robbery of Mr. Cain, one count of aggravated assault of Mr. Cain, one count of facilitation of aggravated assault of Mr. Cain, one count of facilitation of attempted aggravated robbery of Ms. White, one count of aggravated assault of Ms. White, one count of facilitation of aggravated assault of Ms. White, and one count of especially aggravated robbery of Mr. Terry. The trial court merged the aggravated assault of Mr. Cain and facilitation of aggravated assault of Mr. Cain with the attempted especially aggravated robbery of Mr. Cain. The trial court also merged the facilitation of aggravated assault of Ms. White with the aggravated assault of Ms. White. Mr. Gathing received an effective sentence of forty-seven years of imprisonment.

The jury found Mr. Parker guilty of one count of facilitation of attempted especially aggravated robbery of Mr. Cain, two counts of facilitation of aggravated assault of Mr. Cain, one count of facilitation of attempted aggravated robbery of Ms. White, two counts of facilitation of aggravated assault of Ms. White, and one count of

facilitation of especially aggravated robbery of Mr. Terry. The trial court merged the two counts of facilitation of aggravated assault of Mr. Cain with the facilitation of attempted especially aggravated robbery of Mr. Cain. The trial court also merged the two counts of facilitation of aggravated assault of Ms. White into a single count. Mr. Parker received an effective sentence of twenty-six years of imprisonment.

## ANALYSIS

### I. Defendant Jaquan Gathing

On appeal, Mr. Gathing challenges the trial court's denial of his motion to suppress on the grounds that the stop of the vehicle constituted an illegal seizure and that all evidence obtained thereafter was the fruit of the poisonous tree. He maintains that the trial court erred in allowing the State to make improper comments during voir dire, in allowing expert testimony regarding DNA evidence when a sufficient chain of custody was not established, and in improperly instructing the jury regarding the merger of offenses. Mr. Gathing also argues that the State's failure to adequately preserve the record for appeal entitles him to a new trial.

### A. Motion to Suppress

In his motion to suppress evidence obtained from the search of the SUV, Mr. Gathing argued that the search warrant for the SUV was invalid, or alternatively, that the initial stop was unconstitutional, and thus, the warrant was "the fruit of the poisonous tree." The State responded that Mr. Gathing lacked standing to challenge the warrant since he was merely a passenger without a privacy interest in the vehicle.

### 1. Suppression Hearing

Officer Greygor testified that he received a call about a robbery in progress around 2:00 a.m., and he arrived at the apartment complex in less than a minute after receiving the call. He entered the complex and turned in the direction normally used as an exit because he believed the robbers would leave from that direction. He stated that he noticed a "dark SUV without its lights on driving erratically towards [him]." He turned on his blue lights and moved to the side of the road, and the SUV drove past him. He turned around with his blue lights still on and followed the SUV. While following the SUV, he saw the front passenger door open and an occupant jump out as the vehicle slowed down. The SUV eventually came to a stop after another patrol car pulled in front of it.

On cross examination, Officer Greygor reviewed the transcript from his testimony at Mr. Gathing's preliminary hearing. He acknowledged that he had previously described the SUV "as having its lights off sitting." He agreed that he was under oath when testifying at the preliminary hearing and stated that he told the truth. He further testified that he stopped his patrol car, that the SUV's lights turned back on and started to drive again, and that he then turned on his blue lights and tried to block the SUV from leaving. He stated that the SUV appeared suspicious because, first, it did not have its headlights on at 2:00 a.m., and second, he had received a call about a robbery in progress at the apartment complex.

The trial court looked at the totality of the circumstances, noting that Officer Greygor was in a special unit that responds to specific types of events, including robberies. The trial court found that Mr. Gathing was not seized at the time Officer Greygor turned on his blue lights. The trial court further noted that the SUV turning its headlights off and on at 2:00 a.m. in an apartment complex where a robbery is in progress, the SUV fleeing from Officer Greygor after he turned on his lights, an occupant jumping out of the moving SUV, and items being thrown from the SUV all amount to creating probable cause. The court held that the stop was constitutional, that none of Mr. Gathing's rights were violated, and that Mr. Gathing lacked standing to object to the subsequent search.

## 2. Analysis

"On appeal from the denial of a motion to suppress, we review the trial court's legal conclusions de novo with no presumption of correctness." *State v. Dailey*, 273 S.W.3d 94, 100 (Tenn. 2009) (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)). This court defers to the trial court's findings of fact unless the evidence preponderates against such findings. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence from the suppression hearing, as well as "all reasonable and legitimate inferences that may be drawn from that evidence." *Id*.

Mr. Gathing argues that the trial court misapplied the law in determining that the vehicle was not seized at the moment Officer Greygor activated his blue lights. He further argues that Officer Greygor lacked probable cause for the stop, and that alternatively, he should be allowed to challenge the search warrant that was executed on the car.

Mr. Gathing is correct in that the SUV was seized when Officer Greygor activated his blue lights and pulled his patrol car into the middle of the road to block the SUV from moving forward. *See State v. Randolph*, 74 S.W.3d 330, 338 (Tenn. 2002) (determining that the defendant was seized when an officer activated his blue lights and instructed the defendant to stop, despite the fact that the defendant ignored the officer and rode his bicycle away); *State v. Pulley*, 863 S.W.2d 29, 30 (Tenn. 1993) (noting "when an officer turns on his blue lights, he or she has clearly initiated a stop"). Although a warrantless seizure is presumed unreasonable under both the federal and state constitutions, *Yeargan*, 958 S.W.2d at 629, a warrant is not required for a brief investigatory stop if the officer has "a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

We need not determine whether reasonable suspicion existed in this case, however, because Mr. Gathing is challenging the stop merely as a mechanism to suppress the evidence obtained as a result of a search of the vehicle. The evidence seized was not obtained during a warrantless search of the SUV at the time of the stop; instead, the vehicle was later searched pursuant to a search warrant. We note that the record on appeal does not include the search warrant, the affidavit in support of the search warrant, or any other facts showing the basis of the search warrant. We conclude that the failure to include the search warrant in the record precludes our review of the denial of the motion to suppress. *See* Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."); *State v. Elliot*, 366 S.W.3d 139, 148 (Tenn. Crim. App. 2010) ("Because the search warrant does not appear in the record on appeal, we cannot fairly determine whether the warrant was supported by probable cause …."). Therefore, Mr. Gathing is not entitled to relief on this ground.

## B. Voir Dire

Mr. Gathing argues that the trial court erred in allowing the State to ask questions during voir dire that impermissibly sought to commit the prospective jurors to a specific course of action. Specifically, Mr. Gathing challenges the following statements and questions:

> We're up here and we're talking and we're laughing and we're trying to make this process as enjoyable as possible. But make no mistake, the allegations in this case are very serious. The allegations in this case involve the accused sitting over here, using guns and a hatchet on four victims ….

We're up here and we're talking[,] but those are the allegations in this case. A gun and hatchet were used on the victims on that night. That's why they're charged with criminal attempt murder first, especially aggravated robbery, aggravated robbery, [and] aggravated assault acting in concert. Given the nature of that, if you were to have multiple people who had seen that or experienced that, how many here would expect that they would all have the same story? Would anybody here expect the people that were subjected to that kind of a thing or that saw that would have the exact same story? How many here would think each person might remember something differently?

Mr. Gathing objected to these questions, arguing that the State's questions were improper. The trial court overruled the objection and found that the questions were a proper way of determining whether the jury could hear different versions of facts and still consider the issues at hand. The court also noted that the State could state the allegations of the case and that no specific information regarding the case had been stated. Mr. Gathing argues on appeal that the trial court erred in overruling his objection and in failing to give a curative instruction. He specifically maintains that the State solicited commitments from the prospective jurors based on hypotheticals and facts from the case at hand. The State responds that its questions permissibly sought to determine if the prospective jurors had preconceptions about witness credibility.

A trial court has wide discretion in matters regarding the examination of prospective jurors, and its decision will be not reversed absent an abuse of discretion. *Soloman v. State*, 489 S.W.2d 547, 550 (Tenn. Crim. App. 1972). The purpose of voir dire examination is to advise counsel of the qualifications, interests, or biases of the prospective jurors. *Smith v. State*, 327 S.W.2d 308, 318 (Tenn. 1959). "During voir dire, prospective jurors cannot be asked hypothetical questions which seek to commit them to a specific course of action." *State v. John Harris*, No. W1999-00297-CCA-R3-CD, 1999 WL 1097843, at *6 (Tenn. Crim. App. Nov. 23, 1999) (citing *Soloman*, 489 S.W.2d at 550). Prospective jurors can be questioned, however, about their "willingness to decide an issue based on all of the evidence presented at trial, free from any preconceived notions." *Id.*

In *State v. Coe*, a defendant was charged with the aggravated kidnapping, aggravated rape, and murder of an eight-year-old victim, and during voir dire, the State asked the prospective jurors if they believed that anyone would have to be insane to harm an eight-year-old child. 655 S.W.2d 903, 911 (Tenn. 1983). Our supreme court determined that the questioning did not result "in any commitment beyond the appropriate willingness to decide the issue of insanity on all of the evidence adduced at

- 11 -

the trial, free of any preconceived notion that the mere fact of harming an eight-year-old child constituted prima facie evidence justifying a presumption of insanity." *Id; see also John Harris*, 1999 WL 1097843, at *5-7 (concluding that the State's questions regarding the physical evidence of rape "were an attempt to ensure that the jurors would consider all of the evidence and not vote to acquit based solely on the victim's denial of the rape or the lack of eyewitnesses"). In *State v. Walter Williams*, a prospective juror was asked: "If a crime was committed and there is one witness, do you believe that you could determine the credibility of that one witness and make a decision about the case if there's only one witness?" No. W2009-02438-CCA-R3-CD, 2011 WL 2306246, at *6 (Tenn. Crim. App. June 7, 2011) (internal quotations omitted). This court determined that such questioning did not attempt to commit the prospective juror to a specific decision because the question was asked "to determine whether a juror *could* base his decision on his determination of the credibility of a single witness presented at trial" rather than requiring the juror to find a witness credible. *Id.*

We agree with the State's argument that it merely attempted to determine if the prospective jurors could hear differing eyewitness testimony and still be willing to consider the issues of the case, free of any preconceived notions about witness credibility. The State did not attempt to solicit a commitment from the jurors to find a certain witness credible or to make a specific decision regarding the case. We conclude that the State did not solicit commitments from the prospective jurors and that the trial court did not abuse its discretion in allowing the State's questions.

### C. Chain of Custody

Mr. Gathing argues that the trial court erred in allowing expert testimony regarding DNA evidence because a sufficient chain of custody was not established for the items. More specifically, Mr. Gathing points to the fact that the TBI's report shows that Investigator Greg Flint from the District Attorney General's Office delivered the items to Samuel Frederick at the TBI, who did not testify at the trial.

As required by Tennessee Rule of Evidence 901(a), a witness's ability to identify the evidence or establish an unbroken chain of custody is a condition precedent to the admission of physical evidence. *State v. Davis*, 141 S.W.3d 600, 630 (Tenn. 2004); *State v.* Scott, 33 S.W.3d 746, 760 (Tenn. 2000). The purpose of this rule is to "insure 'that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (quoting *Scott*, 33 S.W.3d at 760). The identity of tangible evidence need not be proven beyond all possibility of doubt, and the State is not required to establish facts excluding every possibility of tampering. *Id.* If the State fails to call all witnesses who handled the evidence, such evidence is not necessarily inadmissible. *Id.* "[W]hen the facts and circumstances that surround tangible

evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* Decisions by the trial court as to the chain of custody of physical evidence are reviewed under an abuse of discretion standard. *Davis*, 141 S.W.3d at 630. The trial court's decision will not be reversed unless it applied an incorrect legal standard or reached a decision against logic or reasoning, resulting in an injustice to the complaining party. *Cannon*, 254 S.W.3d at 295 (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Mr. Gathing argues that the State's failure to call Mr. Frederick as a witness constituted a material "missing link" in the chain of custody because there was no testimony as to how the evidence was preserved and maintained while in Mr. Frederick's care. However, the chain of custody may be adequately established without the testimony of the receiving TBI technician where other testimony demonstrates that proper procedure was followed and there was no indication that tampering had occurred. *See State v. Markreo Quintez Springer and William Mozell Coley*, No. M2012-02046-CCA-R3-CD, 2014 WL 2828932, at *17-18 (Tenn. Crim. App. June 20, 2014); *State v. Earnest Laning*, No. E2011-01882-CCA-R3-CD, 2012 WL 3158782, at *3 (Tenn. Crim. App. Aug. 6, 2012); *State v. Michael Joseph Arbuckle*, No. M2000-2885-CCA-R3-CD, 2001 WL 1545494, at *3 (Tenn. Crim. App. Dec. 5, 2001).

Here, Investigator Flint testified that he delivered the sealed evidence to the TBI. According to the TBI report, Mr. Frederick was the technician who received the evidence from Investigator Flint. Three TBI employees testified to the protocol to be followed by the receiving technician, which included leaving the evidence in its sealed condition and assigning exhibit numbers and a case number to the evidence before placing it in the primary vault. Ms. Marquez testified that when she received the evidence from the vault, it was still in its sealed condition. There was no indication of tampering, loss, or substitution of any of the evidence. Despite the State's failure to call Mr. Frederick to testify, the trial court did not abuse its discretion in finding that the State adequately established the identity and integrity of the evidence tested for DNA with reasonable assurance.

Mr. Gathing also points to the fact that Special Agent Nelson was not present when Ms. Marquez took the samples from the evidence and that these samples, which Special Agent Nelson later tested for DNA, were consumed from the process and were no longer in existence at the time of the trial. Ms. Marquez testified as to whether she took a cutting or scraping on every item analyzed by Special Agent Nelson. The trial court determined that the State established a sufficient chain of custody, accrediting Ms. Marquez's testimony that she properly took samples from the evidence, which Special Agent Nelson analyzed. Accordingly, we discern no abuse of discretion in allowing Special Agent Nelson to testify about the results of the DNA analysis. *See Davis*, 141

S.W.3d at 630 (determining that the trial court did not abuse its discretion in allowing expert testimony when it was established that proper procedure had been followed in the medical examiner's office).

### D. Merger Comments

Mr. Gathing argues that the trial court erred in instructing the jury regarding the merger of offenses. In giving its final instructions to the jury before it began its deliberations, the trial court stated:

> Count one charging attempted murder in the first degree, count three and four charging aggravated assault involving the alleged victim Eric Cain, are … alternative theories under the law for the same incident.

> Although you must return a verdict as to each count, in the event that you convict each or either defendant of more than one of these counts, the counts will be merged for purposes of sentencing and there will only be one sentence for that incident.

> Count six charging attempted murder in the first degree, count eight and nine charging aggravated assault involving the alleged victim Myisha White are alternative theories under the law from the same incident.

> Again, although you must return a verdict as to each count, in the event that you convict each or either defendant of more than one of those counts, the counts will be merged for purposes of sentencing and there will only be one sentence for that incident.

> The crime charged in each count of the indictment is a separate and distinct offense. You must decide each charge separately on the evidence and the law that's applicable to it. The defendant may be found guilty or not guilty of any or all of the offenses charge[d]. Your finding as to each crime charged must be stated in your verdict. You may convict on both or acquit on both or you can convict on one and acquit on the other.

An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by a failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *see* Tenn. R. Crim. P. 30(b). However, failure to raise the issue in a motion for a new trial does constitute waiver, and the issue may be considered only if plain error exists. *Faulkner*, 154 S.W.3d at 58. Mr. Gathing acknowledges that his failure to raise

- 14 -

this issue in his motion for a new trial constitutes waiver and requests this court to review the record for plain error.

The defendant has the burden of showing "'that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016) (quoting *State v. Michael Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016)). For this court to grant relief for plain error, five factors must be established: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice. *State v. Donald Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-41 (Tenn. Crim. App. 1994)). All five factors must be present, and when it is clear from the record that at least one of these factors cannot be established, the court need not consider the remaining factors. *Id.* To show that a substantial right has been adversely affected, the appellant must show that the error affected the outcome of the trial proceedings. *State v. Timothy Ryan Baggett*, No. M2003-02300-CCA-R3-CD, 2005 WL 65541, at *5 (Tenn. Crim. App. Jan. 5, 2005) (citing *United States v. Olano*, 507 U.S. 725, 732-37 (1993)).

A criminal defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). "[I]n non-capital cases, the trial court may not instruct the jury on possible penalties for the charged offense or any lesser-included offenses." *State v. Nicole Pamblanco*, No. M2015-01870-CCA-R3-CD, 2016 WL 6958888, at *8 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Apr. 12, 2017); Tenn. Code Ann. § 40-35-201(b). The concept of merger implicates double jeopardy principles, and accordingly implicates sentencing concerns. *Nicole Pamblanco*, 2016 WL 6958888, at *8; *see also State v. Watkins*, 362 S.W.3d 530, 541(Tenn. 2012).

Mr. Gathing maintains that he has a substantial right to have a correct and complete charge of the law given to the jury, which was adversely affected by the trial court's comments regarding the merging of offenses. He further argues that the merger comments created an impression that if the jury found Mr. Gathing not guilty of one offense and guilty of another offense, then the not guilty conviction would override the guilty conviction when the offenses merged. Although the comments regarding the merging of offenses were improper, Mr. Gathing does not show how the comments adversely affected the outcome of his trial. *See Nicole Pamblanco*, 2016 WL 6948888, at *7-9 (concluding that comments regarding the merging of offenses to a jury during voir dire constituted harmless error). Immediately after the comments were made about the merging of offenses, the jury was instructed that each count was separate and distinct. No other comments were made that referenced any potential sentencing consequences.

- 15 -

Thus, we conclude that Mr. Gathing has not met his burden in showing that a substantial right was adversely affected by the comments made by the trial court, and we decline to find plain error.

### E. Failure to Preserve the Record

Mr. Gathing argues that he should be granted a new trial because testimony spanning a period of nineteen minutes was not preserved for the appeal. According to the record, the first seven minutes of testimony by Sergeant Dupree and the first twelve minutes of testimony by Officer Galloway were not recorded or transcribed by the court reporter. Mr. Gathing argues that because the court reporter was an employee of the State of Tennessee, the State is responsible for failing to preserve the record for appeal.

Tennessee Rule of Appellate Procedure 24(b) gives the appellant the duty to prepare "a transcript … of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of the appeal." *See State v. Hopper*, 695 S.W.2d 530, 537 (Tenn. Crim. App. 1985); *State v. Rhoden*, 739 S.W.2d 6, 14 (Tenn. Crim. App. 1987). If a substantially verbatim transcript is not available, the appellant has the duty to "prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection" and file the statement within sixty days after the notice of appeal is filed. Tenn. R. App. P. 24(c).

Mr. Gathing failed to file a statement of the proceeding, but argues that he could not do so because he was not aware of the missing testimony until after the sixty days had expired. Mr. Gathing filed his notice of appeal on September 28, 2016. The record reflects that Mr. Gathing filed a notice of filing of the transcript to the Criminal Court of Shelby County on January 5, 2017. On the same day, Mr. Gathing filed a motion to remand in this court, in which he noted that there were missing portions of the transcript and requested that the case be remanded to the trial court to "amend his motion for new trial in order to address this issue." Nothing in the motion requested permission to supplement the transcript with a statement of the evidence. This court denied Mr. Gathing's request because a motion for new trial may not be amended after the trial court has ruled upon such motion. On January 19, 2017, Mr. Gathing filed a motion to supplement the record, specifically requesting permission to include the transcripts of the motion to suppress and the motion to sever. This motion likewise did not request permission to supplement the missing portions of the transcript. In our order, this court noted that no appellate record had been filed yet and treated the motion as a motion for an extension of time, allowing Mr. Gathing an additional ten days to file the transcripts of the motion to suppress and motion to sever. At no point during the filing of these motions did Mr. Gathing make any attempt to remedy the missing portions of the

transcript.  The appellate record was filed on February 6, 2017, and no other motions to supplement were filed after that date.

While Mr. Gathing claims that he did not discover the missing portion until after sixty days from the date the notice of appeal was filed, this court may suspend the rules when requested.  *See* Tenn. R. App. P. 2 ("For good cause, including the interest of expediting decision upon any matter, the … Court of Criminal Appeals may suspend the requirements of provisions of any of these rules in a particular case on motion of a party or on its motion ….").  Additionally, Rule 24(e) provides that "[i]f any matter properly includable is omitted from the record … the record may be corrected or modified to conform to the truth."  The Advisory Commission Comment clarifies that such an omission may be remedied "pursuant to the stipulation of the parties or on the motion of a party or the motion of the trial or appellate court."  *See also State v. Jeremy Keeton*, No. M2012-02536-CCA-RM-CD, 2013 WL 1619379, at *6 (Tenn. Crim. App. Apr. 16, 2013) (noting that after the parties made "diligent and exhaustive efforts to compile and prepare a Statement of the Evidence," the Tennessee Supreme Court ordered the trial court to use the trial court's notes to supplement the record with a statement of evidence); *State v. David Henry Hammon*, No. M2009-00723-CCA-R3-CD, 2010 WL 3448105, at *1 n.1 (Tenn. Crim. App. Sept. 2, 2010) (noting that defense counsel filed four separate motions for an extension of time to file the transcript of evidence due to the court reporter's failure to complete the transcript, but ultimately determining that the missing portion of the transcript was not necessary for the court's review of the issue); *State v. Tommy Pleas Arwood, Jr.*, No. M2003-01125-CCA-R3-CD, 2007 WL 1890100, at *1 (Tenn. Crim. App. June 28, 2007) (noting a series of events that resulted in this court remanding the case for the preparation of a statement of evidence by the trial court).

The record does not show any attempts by Mr. Gathing to remedy the omission of missing testimony.  While Mr. Gathing did file a motion seeking remand for the limited purpose of amending his motion for a new trial, he did not request permission to prepare a statement of the evidence regarding the missing portions of the transcript.  Because Mr. Gathing failed to perform his duty of filing a statement of the proceeding and failed to take any further actions to correct the record after learning of the missing testimony, he is not entitled to relief on this ground.

Mr. Gathing further argues that the analysis under *State v. Ferguson* should apply in this context.  *Ferguson* provides the analysis that governs claims alleging the State's failure to preserve potentially exculpatory evidence. 2 S.W.3d 912, 916-18 (Tenn. 1999).  The purpose of the analysis in *Ferguson* is to preserve a defendant's fundamental right to a fair *trial*.  *Id*. at 916 (emphasis added); *see State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013) ("[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as evidence that might be expected to play a significant role

in the suspect's defense." (internal quotations omitted)).  Mr. Gathing's claim does not relate to potentially exculpatory evidence which may have played a role in his defense at trial.  Therefore, we decline to extend *Ferguson* to this issue.

## II. Defendant Prince Parker

On appeal, Mr. Parker argues that the evidence was insufficient to support his convictions, and he specifically maintains that the convictions were impermissibly based upon the uncorroborated testimony of a co-defendant.  Mr. Parker also argues that the trial court erred in admitting a photograph of Mr. Johnson's injuries when it was not established at trial that Mr. Johnson was a victim of the attack at hand.  Finally, Mr. Parker argues that his sentences were excessive due to the erroneous application of enhancement factors and that the decision to run his sentences consecutively was an abuse of discretion.

### A. Sufficiency of the Evidence

Mr. Parker argues that the evidence was insufficient to support his convictions. Mr. Parker argues that the convictions were improperly based on Ms. Brown's uncorroborated testimony and circumstantial evidence.  He maintains that Ms. Brown was the only witness able to place Mr. Parker at the scene of the crime and that there was insufficient corroborating evidence to establish his identity.

When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e).  The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted).  The court determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence.  *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

Mr. Parker asserts that a closer reading of *Jackson v. Virginia*, 443 U.S. 307, "requires the appellate court to re-weigh and reevaluate the evidence and only affirm the conviction when it determines that the evidence was so strong as to justify a finding of guilt beyond a reasonable doubt."  This assertion is without merit.  This court does not reweigh the evidence. *Stephens*, 521 S.W.3d. at 724 (citing *State v. Evans*, 838 S.W.2d

185, 191 (Tenn. 1992)). The Supreme Court of the United States noted in *Jackson*, "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." 443 U.S. at 319. Thus, "'the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Stephens*, 521 S.W.3d. at 724 (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). "'[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts' in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

Mr. Parker was convicted of one count of facilitation of attempted especially aggravated robbery and two counts of facilitation of aggravated assault of Mr. Cain, one count of facilitation of attempted aggravated robbery and two counts of facilitation of aggravated assault of Ms. White, and one count of facilitation of especially aggravated robbery of Mr. Terry. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display or any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "[w]here the victim suffers serious bodily injury." *Id.* § 39-13-402(a). Especially aggravated robbery is robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." *Id.* § 39-13-403(a). Aggravated assault occurs when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101," which "[r]esults in serious bodily injury to another" or "involved the use or display of a deadly weapon." *Id.* § 39-13-102(a)(1)(A)(i), (iii) (Supp. 2013). Criminal attempt occurs when a person:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the

- 19 -

conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

*Id.* § 39-12-101(a). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-13-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a).

When the State presents testimony from an accomplice at trial, "[t]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Such corroborative testimony need not be adequate to support a conviction on its own and may be direct or entirely circumstantial. *Id.* The corroborating evidence is sufficient if it "'tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.'" *Id.* (quoting *Gaylor*, 862 S.W.2d at 552).

Identity is an essential element of any crime. *State v. Bell*, 512 S.W.3d 167, (Tenn. 2015). Identity may be established with circumstantial evidence alone. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). "[T]he evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *Dorantes*, 331 S.W.3d at 380-81). The jury determines the weight to be given, and inferences to be drawn from, circumstantial evidence. *State v. Gibson*, 506 S.W.3d 450, 458 (Tenn. 2016) (citing *Dorantes*, 331 S.W.3d 379). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

Here, Ms. Brown testified that Mr. Parker told her that he was going to rob some people for money and "weed," that Mr. Parker drove to the apartment complex, that Mr. Parker and Mr. Gathing put on masks and bandanas and disappeared for thirty minutes to an hour, and that Mr. Parker sat in the front passenger seat of the SUV upon his return. Officer Greygor testified that he saw a black male fitting Mr. Parker's size jump out from the front passenger seat. The stain from the inside of the front passenger door tested positive for blood and Ms. White's DNA. The mask that Officer Greygor observed falling out of the SUV contained Mr. Parker's DNA and was identified by Mr. Cain as

- 20 -

being worn by one of the attackers. Mr. Cain and Ms. White both described one of the attackers as having dreadlocks, which matched the hairstyle of Mr. Parker on the day of the attack. In addition, the statements made by Mr. Parker demonstrated his own knowledge of the details of the attack. He approached police where the SUV had been stopped and stated that he was the owner of the SUV. He stated that the attack was committed with a work hatchet, that a shotgun was located inside the SUV, and that a Tec-9 was normally kept under the seat in the SUV. Both guns were found inside Mr. Parker's vehicle. The circumstantial evidence sufficiently corroborates Ms. Brown's testimony, and the evidence presented at trial is sufficient to support Mr. Parker's identity as a perpetrator.

## B. Photograph of Rico Johnson

Mr. Parker argues that the trial court erred in admitting a photograph of Mr. Johnson's "beaten up face" when it was never shown that Mr. Johnson was a victim of the attack. Mr. Parker maintains that the photograph was irrelevant and confused the jury as to who was actually injured by the attack and what injuries were sustained.

Sergeant Cave testified at trial that he visited the hospital after the attack and photographed the victims and their injuries. Photographs of the victims were admitted into evidence. When the State attempted to introduce a photograph of Mr. Johnson's injuries into evidence, defense counsel objected, arguing that the photograph was irrelevant because Mr. Johnson did not testify as to his injuries and that the testimony of the other victims did not establish that Mr. Johnson was a victim of the attack. The trial court disagreed and stated that the previous testimony had established that Mr. Johnson did go outside with the other victims when the attack began and that Sergeant Cave saw Mr. Johnson at the hospital, spoke with him, and took photographs of him. The trial court concluded that the photograph of Mr. Johnson's injuries was relevant and admitted it into evidence. Later during the trial, Ms. Stinson testified that Mr. Johnson had been in an altercation earlier in the day that resulted in the injuries depicted in the photograph of Mr. Johnson that was admitted into evidence. Ms. Stinson viewed the photograph of Mr. Johnson and testified that his injuries appeared the same as they did after the altercation and before the robbery.

"It is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Relevant evidence is defined as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible but may be excluded "if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 402, 403.

At the time the photograph was admitted into evidence, Mr. Parker had been charged with aggravated robbery committed against Mr. Johnson. The evidence at that point in the trial had established that Mr. Johnson was outside with the other three victims when the attack began and that he exhibited fresh injuries which required treatment and which were consistent with the injuries received by the other victims. Although subsequent evidence suggested that the injuries were caused by another source, the photograph was relevant to the issues at trial at the time it was admitted. The photograph depicted Mr. Johnson's appearance within an hour of the attack and was relevant to the determination of whether his injuries were sustained from the attack. The photograph was not excessively gruesome or unfairly prejudicial. *See State v. Reid*, 164 S.W.3d 286, 319 (Tenn. 2005). Therefore, the trial court's determination that the photograph was relevant was not an abuse of discretion. Furthermore, any error in admitting the photograph was clearly harmless as Ms. Stinson later testified that the injuries in the photograph were not a result of Mr. Parker's actions.

## C. Sentencing

Mr. Parker argues that the trial court erred by applying six enhancement factors, sentencing him to the maximum sentence for each conviction, and running each sentence consecutively. The State responds that the trial court did not abuse its discretion because the trial court properly applied the purposes and principles of sentencing and because each sentence is within the appropriate range.

### 1. Sentencing Hearing

Mr. Parker was convicted of facilitation of attempted especially aggravated robbery, a Class C felony, in Count 2; facilitation of aggravated assault, a Class D felony, in Counts 3, 4, 8, and 9; facilitation of attempted aggravated robbery, a Class D felony, in Count 7; and facilitation of especially aggravated robbery, a Class B felony, in Count 11. *See* T.C.A. §§ 39-11-403(b); 39-12-107(a); 39-13-102(e)(1)(A)(ii); 39-13-402(b); 39-13-403(b). The trial court merged Counts 3 and 4 into Count 2 as lesser included offenses. The trial court also merged Count 9 into Count 8.

The trial court applied no mitigating factors and six enhancement factors to all counts: that Mr. Parker was a leader in the commission of each offense; that each offense involved more than one victim; that Mr. Parker treated or allowed each victim to be treated with exceptional cruelty; that the personal injuries inflicted upon each victim were

particularly great; that Mr. Parker possessed or employed a firearm in the commission of the offense; and that Mr. Parker had no hesitation about committing a crime when the risk to human life was high.  *See* T.C.A. § 40-35-114(2), (3), (5), (6), (9), and (10) (Supp. 2013).  The court noted its hesitation in applying all the enhancement factors, except that Mr. Parker was a leader in the offenses, to each count but determined that since Mr. Parker was convicted of facilitation of the various offenses, then these factors could be properly applied.  The trial court also made it clear that it was giving little weight to these factors and was primarily giving weight to factor (2), that Mr. Parker was a leader in the commission of the offenses, noting its belief that Mr. Parker played a major role in the offenses even though the jury returned verdicts of facilitation.

The trial court described the attack as a "brutal senseless … savage beating" and described the victims' testimony and photographs of their injuries as "chilling."  The court also stated, "[T]he savage way in which they robbed and violated and beat these people, to me is a great indication of an anti-societal lifestyle of Mr. Parker's activities."  The trial court found that the circumstances surrounding the commission of these offenses were "extremely aggravated" and that the injuries inflicted were "extremely aggravated and serious" as to all three victims.  The court determined that "confinement for an extended period of time is necessary to protect society from [Mr. Parker's] unwillingness to lead a productive life and his resort to criminal activity and furtherance of that anti-societal lifestyle."

Mr. Parker received within-range sentences, as a Range I offender, of six years for Count 2, four years for Count 7, four years for Count 8, and twelve years for Count 11. *See* T.C.A. § 40-35-112(a)(2), (3), and (4).  All four sentences were to run consecutively to one another, resulting in an effective sentence of twenty-six years.

## 2. Application of Enhancement Factors

Mr. Parker challenges the application of all six enhancement factors.  Although Mr. Parker states in his brief that sentencing decisions are reviewed de novo, a trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing.  *State v. Bise*, 380 S.W.3d 682, 707-08 (Tenn. 2012).  A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining.  *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).  The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise*, 380 S.W.3d at 709-10.  The trial court is "to be guided

by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Id.* at 706. The "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party has the burden to show that the sentence was improper. *State v. Cooper*, 336 S.W.3d 522, 525 (Tenn. 2011).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) the evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(4), (5).

Mr. Parker argues that the trial court misapplied enhancement factor (2), that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors." *Id.* § 40-35-114(2). Mr. Parker contends that the jury did not conclude that Mr. Parker was the main actor in the offenses since he was merely convicted of facilitation and that the definition of facilitation is contrary to what it means to be a leader. However, for this enhancement factor to apply, Mr. Parker does not need to be the *sole* leader in the commission of the offense, but merely *a* leader. *State v. Robinson*, 972 S.W.2d 30, 47 (Tenn. Crim. App. 1997). "One may even act at the direction of another and be a leader in the offense." *Id.* (citing cases). Mr. Parker also argues that the facts do not support the application of this factor because the evidence was based on the uncorroborated testimony of Ms. Brown. As determined above, Ms. Brown's testimony was sufficiently corroborated. Moreover, "facts relevant to sentencing need be established only 'by a preponderance of the evidence and not beyond a reasonable doubt.'" *Cooper*, 336 S.W.3d at 524 (quoting *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000)). We conclude that the facts here support the trial court's finding that Mr. Parker was a leader in the offense.

Mr. Parker argues that enhancement factor (3) should not have been applied to Count 7 because "there cannot be multiple victims for any one offense … committed

against a specific, named victim." *State v. Imfeld*, 70 S.W.3d 698, 706 (Tenn. 2002). He argues that enhancement factors (5), (6), and (9) should not have been applied because they constitute elements of the underlying offenses. He also argues that factor (10) should not have been applied because it is an inherent condition in the particular offense and because all crimes committed with a deadly weapon entails a risk to human life. The trial court noted its hesitation in applying these factors but did so because Mr. Parker was convicted of facilitation of the underlying offenses rather than the underlying offenses themselves. The trial court accordingly gave little weight to these factors, and instead primarily looked at Mr. Parker's role as a leader in the attack. In *State v. Bise*, the appellate court upheld the sentence lengths, even though the trial court misapplied the only enhancement factor upon which it relied, because each sentence was within the proper range and was consistent with the purposes and principles of sentencing. *Id.* at 708-09. Here, the trial court properly found that Mr. Parker was a leader in the offenses, and this court may not reweigh the application of enhancement and mitigating factors. *See Id.* at 699. Nothing in the record demonstrates that the trial court wholly departed from the statutes in applying the enhancements factors and imposing within-range sentences. *See id*. at 706. Accordingly, although the trial court misapplied the other enhancement factors, the court did not abuse its discretion in imposing the length of each sentence.

### 3. Consecutive Sentencing

Mr. Parker also argues that the trial court erred in running his sentences consecutively. The decision to impose consecutive sentences rests within the sound discretion of the trial court. *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The standard of review for consecutive sentencing is abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862. Consecutive sentencing is "guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *Imfeld*, 70 S.W.3d at 708 (citing T.C.A. §§ 40-35-102(1), -103(2)).

To impose consecutive sentencing, the trial court must find by a preponderance of the evidence at least one of seven factors listed in Tennessee Code Annotated section 40-35-115(a), which includes that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b). The trial court need only find one of the criteria listed in the statute to properly impose a consecutive sentence.

*State v. Alder*, 71 S.W.3d 299, 307 (Tenn. Crim. App. 2001). When basing its consecutive sentencing determination on the "dangerous offender classification, the trial court must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)).

In determining that Mr. Parker's sentences were to run consecutively, the trial court found that Mr. Parker's behavior "indicate[d] little or no regard for human life and that he has no hesitation about committing this offense in which the risk to human life was very high." The court found that "confinement for an extended period of time is necessary to protect society from [Mr. Parker's] unwillingness to lead a productive life and his resort to criminal activity and furtherance of that anti societal lifestyle." The court also found that the aggregate length of the sentences reasonably relates to the severity of the offenses committed.

Mr. Parker argues on appeal that there was "very little to no evidence in the record" to support the court's findings, arguing that there was no proof in the record that Mr. Parker was responsible for any of the crimes and that the only testimony regarding Mr. Parker's involvement came from Ms. Brown, who Mr. Parker argues was not a credible witness. We disagree. As previously determined, the evidence was sufficient to support Mr. Parker's convictions. The trial court relied upon the same evidence that supported the convictions to conclude that Mr. Parker had little disregard for human life and did not hesitate in committing the offense for which the risk to human life was high. The court specifically stated that testimony from the victims was "chilling," that it was "quite obvious that the victims in this case did not resist," and that the victims had been "tortured" and "savagely beaten." The trial court properly determined that Mr. Parker had an active role in the offenses and even concluded that Mr. Parker was a leader in the offenses. The evidence introduced supports the trial court's findings. Accordingly, the trial court did not abuse its discretion in running the sentences consecutively.

**CONCLUSION**

Based on the foregoing, we affirm the judgments of the trial court as to both Defendants. We note that Mr. Parker was indicted in Count 4 for aggravated assault with a deadly weapon while acting in concert with two or more people, and the jury returned a guilty verdict as to Count 4 for facilitation of aggravated assault with a deadly weapon. However, the judgment form lists facilitation of aggravated assault with serious bodily injury. We also note that Mr. Parker's conviction for facilitation of especially aggravated robbery in Count 11 is a Class B felony, but the judgment form lists the offense as a

Class C felony.  Accordingly, we remand this matter for entry of corrected judgments against Mr. Parker.


_____
JOHN EVERETT WILLIAMS, JUDGE